[No. 52556-1. En Banc. February 19, 1987.]

FRED HUTCHINSON CANCER RESEARCH CENTER, ET AL,
*Respondents,* v. WILLIAM M. HOLMAN,
ET AL, *Appellants.*

*Eugene D. Seligmann* and *Seligmann, Dreiling & Beckerman,* for appellants (counsel for appeal only).

*Shidler, McBroom, Gates & Lucas,* by *William H. Gates, Martin F. Smith,* and *Heather L. Coughlan,* for respondents Charitable Beneficiaries.

*Kenneth O. Eikenberry, Attorney General,* and *James B. Wilson, Senior Assistant,* for respondent University of Washington.

*Kenneth O. Eikenberry, Attorney General,* and *Marjorie R. Schaer, Assistant,* for respondent Attorney General.

*Graham & Dunn,* by *W. H. Jaynes, Jr., Michael E. Kipling,* and *Gerald Koblentz,* for Seattle–First National Bank.

UTTER, J.—Cotrustee William M. Holman has challenged trial court findings and conclusions that his fees were excessive and must be repaid and that he must be removed as trustee. Several procedural matters concerning this appeal are also before the court. For reasons outlined below, we affirm the trial court. We also hold for the plaintiffs on all disputed motions.

The record in this case is voluminous. The Report of Proceedings is over 1,600 pages; there are at least 160 exhibits; over 300 pages of briefs and supplemental memoranda; and 38 pages of findings and conclusions. Appellants Holman raise 41 issues.

On April 21, 1983, charitable beneficiaries (Beneficiaries) of the Stuart trusts initiated this suit against the trusts' cotrustees, William M. Holman and Seattle–First National Bank. On July 6, 1984, the plaintiffs settled their differences with the bank, which subsequently testified on plaintiffs' behalf. The court held a bifurcated trial. The first part, regarding Holman's excessive fees (Fee Hearing), began July 23, 1984. The second part, regarding Holman's removal (Removal Hearing), began December 10, 1984. After considering much testimony, Holman's personal memoranda and other exhibits, as well as transcripts of taped conversations between Holman and others involved with these trusts, the trial court found the following facts.

## THE WILL AND ITS TERMS

The trusts at issue arose out of the late DeEtte McAuslan Stuart's will, supplemented by two codicils. All three of these instruments were prepared for Mrs. Stuart by Wil-

liam M. Holman, her attorney at the time, and the defendant in this action. Mrs. Stuart did not receive independent legal counsel as to the provisions in these instruments affecting or involving Mr. Holman.

Mrs. Stuart created the following trusts: the "Office Trust," 23 Charitable Remainder Annuity Trusts (CRAT's), and the Charles Edward Stuart Charitable Trust (Charitable Trust). The Office Trust was established to pay the expenses and costs of assuming the lease and continuing Mrs. Stuart's office. The 23 CRAT's, now numbering 20 due to the deaths of three beneficiaries, provide for a regular annuity payment for the lifetime of the individual beneficiaries named in each such trust. Upon the death of an individual annuitant/beneficiary, the remaining principal of the individual's CRAT transfers to the Charitable Trust. The Charitable Trust was established as a permanent memorial to Mrs. Stuart and her late husband Charles Edward Stuart. By the terms of article 13, the Charitable Trust is perpetual, there can be no invasion of its principal, and its income is to be paid in various proportions to the beneficiaries quarterly.

The will of DeEtte McAuslan Stuart also established the following relevant trust: article 9 established the DeEtte McAuslan Stuart Scholarship Trust pursuant to which $1 million was given in trust to the Board of Regents of the University of Washington to be held in trust for scholarships. A committee on scholarships consisting of William M. Holman, Robert D. Keith and William McGregor selected the scholarship recipients. The will provides that the committee members shall serve without pay.

Besides the appointment of Holman and the bank as executors of her estate and cotrustees of the trusts, the key provisions of the last will and testament of DeEtte McAuslan Stuart, as modified by the first and second codicils, are as follows:

> My trustees shall be each paid normal compensation for acting as trustees under the applicable trust established in this will and shall be paid on a quarterly basis.

Article 19, exhibit 2.

My trustees shall be fully protected in relying upon the advice of legal counsel and shall not be liable for any loss or damage caused by any agent or attorney selected by it if it shall have exercised reasonable care in selecting and retaining such agent or attorney.

Article 14, section 3(a), exhibit 2.

Any and every action taken in good faith by my trustees in the exercise of any power, authority, judgment or discretion conferred upon it hereunder, shall be conclusive and binding upon all persons interested in the assets of any trust.

Article 14, section 3(b), exhibit 2.

The governing bodies of any charitable beneficiary shall have the power to enforce the trust and to compel an accounting under state law.

Finding of fact 3.2.1(h), exhibit 3.

### Death of Mrs. Stuart/Establishment and Operation of Trusts

DeEtte McAuslan Stuart died on September 17, 1979. Her last will and testament, first codicil and second codicil thereto, were admitted to probate on September 25, 1979. Some time during the month of November 1979, assets were transferred from Mrs. Stuart's estate into the CRAT's in order to fully fund these trusts. Additional assets were transferred to the Charitable Trust and, by March 31, 1980, the trust was funded in the amount of $11,063,522. After this initial funding, the Charitable Trust received additional funds from the CRAT's that terminated and additional transfers from the estate between June 7, 1980 and May 7, 1984 to make the total contributions to the Charitable Trust as of May 7, 1984, $13,857,847.56.

Custody of all trust assets was placed, and has remained to this date, with Seattle–First. Seattle–First performs all management and custodial services including bookkeeping, tax returns, quarterly reports and payments. The Office Trust and the Charitable Trust were each placed in separate accounts over which both trustees had management

authority. The CRAT's, however, were placed in Seattle–First's "D" fund, investment of which was under the sole management of Seattle–First. The CRAT's remained in the "D" fund until August 15, 1983 when they were placed in a separate account over which both trustees have control. Pursuant to the terms of article 14, section 1(c) of Mrs. Stuart's will (exhibit 2), the assets of each trust can only be invested in obligations of the United States of America, municipal securities, high grade stocks, bonds and other securities and obligations of any state in the union with the exception of Washington, California and New York. Investment in real estate, directly or indirectly, is prohibited.

## FEES CHARGED BY THE COTRUSTEES

After the partial or complete funding of the Office Trust, the CRAT's, and the Charitable Trust, both defendant Holman and Seattle–First began to charge fees to these trusts for their services as trustees. Seattle–First charged its fees in accordance with its published fee schedules.

In February 1980, defendant Holman began charging the trusts for his services as trustee. Initially, Holman billed the trusts on a monthly basis, based upon the hours he reportedly incurred in working as trustee. Defendant Holman's monthly billings on an hourly basis continued from February 1980 through April 1981. At this point in time, Holman devised a percentage fee whereby he would be paid a flat rate of .85 percent of the market value of each trust. Defendant Holman derived his percentage charge after considering the following factors: (a) the average charge by investment counselors in the Seattle area (0.5 percent) and nationwide (0.6 percent) (from a Wall Street Journal article); and (b) the statement in *In re Powell,* 68 Wn.2d 38, 43, 411 P.2d 162 (1966) that the most that the court could determine was a reasonable fee for one individual trustee was 1.5 to 1.6 times the fee that a bank trust department would charge. Holman multiplied the Seattle average of 0.5 percent times 1.5 and obtained 0.75 percent. He multiplied

the nationwide average of 0.6 times 1.6 and obtained 0.96 percent. He then averaged 0.75 percent and 0.96 percent to 0.855 percent which he rounded to 0.85 percent. Defendant Holman's percentage fee took effect for the quarter beginning May 16, 1981, and has continued since that date. Holman has, however, kept additional time records since May 15, 1981. Defendant Holman's fee is taken 80 percent from principal and 20 percent from income.

The cotrustees informed Beneficiaries of both Holman's fee and Seattle–First's fee in a letter to Beneficiaries dated July 23, 1981. Within approximately 4 months of receiving the cotrustees' letter regarding fees, various Beneficiaries questioned the cotrustees regarding their fees and expressed their belief that the fees were too high.

From the inception of the Charitable Trust and the Office Trust through August 15, 1984, Mr. Holman has been paid fees in the amount of $537,341.65 for his services as cotrustee of the Charitable Trust and $21,402.06 for his services as cotrustee of the Office Trust. From the inception of the CRAT's through August 15, 1983, Mr. Holman has been paid $73,552.78 for his services as cotrustee of these trusts. For the period of August 16, 1983 through August 15, 1984 Mr. Holman received $19,437.86 for his services as cotrustee of the CRAT's.

From the inception of the Charitable Trust and the Office Trust through August 15, 1984, Seattle–First has been paid $413,604.28 for its services as cotrustee of the Charitable Trust and $13,943.36 for its services as cotrustee of the Office Trust. For the period from the inception of the CRAT's through August 15, 1983, Seattle–First was paid $101,937.63 for its services as cotrustee of the CRAT's and for the period August 16, 1983 through August 15, 1984 Seattle–First was paid $25,998.08 for its services of cotrustee of the CRAT's.

While Seattle–First did allow defendant Holman to be paid his fee of 0.85 percent of asset value, it never approved of this fee.

## "Normal Compensation" for an Individual Cotrustee

It was overwhelmingly established that "normal compensation" for a fully active individual cotrustee is, at most, 50 percent of the corporate cotrustee's fee. This finding is based upon the following further findings.

### Cost of Administration

Fifty percent of the cost involved in acting as a trustee relates to the cost involved in trust administration. William M. Holman has performed none of the administration services; they are entirely undertaken by Seattle–First.

### The Custom in the Community

The testimony of William Shaumberg, Charles Osborn, Richard Fulp, and William Blanchard, whose testimony the court found to be credible, establish that the custom and practice in the community is that an individual cotrustee receives, at most, a fee of 50 percent of the corporate cotrustee's fee. This 50 percent figure is further supported by the information contained in Seattle–First's answers to the plaintiff's first and second set of interrogatories. If the individual cotrustee undertakes no investment responsibilities, then a normal fee for the individual cotrustee is 25 percent of the corporate cotrustee's fee. While the fees charged by attorneys and investment counselors are a factor considered, the standard provided by the will is that of normal compensation of a cotrustee, not normal compensation for an attorney or investment counselor.

### Time Required

Holman alleged that his cotrustee responsibilities require that he, David Dobbs, or Holman's other associates acting in his capacity, spend 7 hours per day on the Stuart trusts. The trial court found 7 hours per day to be excessive and not required of an individual cotrustee in the management of these trusts.

### Risk and Responsibility

As his risk and responsibility is shared with a corporate

cotrustee, Holman's exposure as an individual cotrustee is substantially less than that of a sole trustee.

## Performance of Trust

The performance of a particular trust is a result of a joint effort between the two cotrustees, and the court found it inappropriate to distinguish the value of each trustee's performance.

## HOLMAN'S FEES HAVE NOT BEEN "NORMAL"

Defendant Holman's trustee's fee of 0.85 percent of the asset value of the trust was found to be abnormal, excessive, and unjustified. Holman's fee for serving as trustee should have been, at most, 50 percent of the applicable fee schedule of the corporate cotrustee. This fee would apply to his responsibilities for all of the trusts, with the exception of the CRAT's, during the time they were in Seattle–First's "D" fund. During that period, the CRAT's fee should have been 25 percent of the applicable fee schedule of the corporate cotrustee.

## HOLMAN'S ACCESS TO INVESTMENT INFORMATION FROM COTRUSTEE SEATTLE–FIRST

Defendant Holman has had access to the investment resources of Seattle–First equal to or greater than that of other cotrustees. There is no evidence to support defendant Holman's argument that he did not have adequate access to Seattle–First's investment information or that a lack of access necessitated more work or a higher fee. Holman's extensive access to the bank's resources was well documented.

## PRINCIPAL/INCOME ALLOCATION OF DEFENDANT HOLMAN'S FEE

The court's determination of the normalcy of Holman's fee was not affected by the fact that Holman charged the bulk of his fee against trust principal. While that practice may have a short term effect of buffering the impact of the fee on Beneficiaries, in the long term it is harmful because it depletes the principal, slowing or stopping its growth

and, therefore, decreasing the amount of income earned by the principal.

## Mrs. Stuart's Intent

Mrs. Stuart, in the instances where she mentioned compensation, stated that the bank, Mr. Holman and Mr. Keith "shall be paid normal compensation in their respective capacities" (article 18, exhibit 2), and that her "trustees shall be each paid normal compensation" (article 19, exhibit 2). The settlor could have paid an abnormally high fee had she chosen to do so. She chose, however, to pay normal compensation. Mrs. Stuart did not intend that the good faith clause apply to the trustees setting or taking their own compensation. Mrs. Stuart did not intend to pay abnormally high compensation even if the trustee took such compensation in good faith.

## Holman's Lack of Good Faith in Setting and Taking His Fee

William Holman knew from the outset that a normal individual cotrustee's fee was equal to one–half of the corporate trustee's applicable fee schedule. In the first half of 1980, Mr. Holman engaged the services of Sharon L. Dean, information broker of Information Unlimited, to do research and advise him what a reasonable fee charged by him would be. In a letter to Mr. Holman dated June 5, 1980, Sharon L. Dean transmitted to him the results of her research. Her letter stated, "Based on my findings, I would deduce that .2 of 1% to .3 of 1% on the annual value of the trust would be considered a reasonable fee." Exhibit 42. Mr. Holman testified that the average charge by investment counseling firms for managing an account the size of the Stuart trusts was .5 of 1 percent to .6 of 1 percent. Ms. Dean's information indicates that the normal cotrustee fee of .2 percent to .3 percent is one–half of that average.

William Blanchard, Assistant Vice President and Manager of the Charitable Trust Administration Section of Seattle–First, told Mr. Holman in an early meeting regard-

ing the Stuart trusts that Holman's fee should be 50 percent of the bank's fee.

### Mr. Holman's Legal Opinion Regarding His Trustee's Fees

In the course of administering the Stuart trusts, Mr. Holman gave, and relied upon, his own legal opinion as to his trustee's fees. The court found it was improper for Mr. Holman to have provided and charged the trusts for this legal opinion and it was further improper for Mr. Holman, as the will's drafter, to rely on this opinion.

Having provided the trustees with the legal opinion that his fees were allowable under Mrs. Stuart's will, Mr. Holman then claimed that this opinion gave the trustees the protection of article 14, section 3(a) of the will which states that "[m]y trustees shall be fully protected in relying upon the advice of legal counsel and shall not be liable for any loss or damage caused by any agent or attorney selected by it if it shall have exercised reasonable care in selecting and retaining such agent or attorney." Seattle–First did not affirmatively agree to have Mr. Holman provide a legal opinion regarding his fees. Any and all affirmative actions taken by the cotrustees required the joint affirmation of the trustees.

Mr. Holman claimed that the provisions of article 14, section 3(b), the good faith clause, protect him as trustee. As the attorney engaged to write the testator's will, he is precluded from reliance on this clause to limit his liability when the testator did not receive independent advice as to its meaning and effect.

### The Stuart Trusts Are Not Unique

The responsibilities of a cotrustee of the Stuart trusts are comparable to the duties of other cotrustees. They are relatively simple trusts. The will provides that all of the assets must be invested in high grade stocks and bonds or in cash equivalents and that they cannot be invested in real estate or mortgages or other kinds of ventures. The cotrustees have no real estate to manage and no ongoing business to

operate. The distribution provisions under the Charles E. Stuart Charitable Trust, the Office Trust and the CRAT's are also simple. The income from the Charitable Trust is distributed quarterly in predetermined percentages to the 11 beneficiaries of the trust. The cotrustees are not required to select beneficiaries or to interview applicants, review grant applications or exercise any discretion in the distribution of trust funds. The CRAT's require that a set dollar amount be distributed to their named beneficiaries. The Office Trust requires distributions of amounts necessary to maintain Mrs. Stuart's office. The evidence presented to the court on what constitutes a normal trustee fee was evidence about trusts in which trustee's responsibilities are comparable to or greater than those under the Stuart trusts.

### THERE IS NO EVIDENCE SUPPORTING LACHES, ESTOPPEL, WAIVER OR CONSENT

Defendant Holman did not establish by any evidence his affirmative defense of laches, waiver, estoppel, or consent. The trial court's conclusions reflected these findings. Specifically the court held that (1) Holman's fees should be and should have been 50 percent of the bank's fees; (2) article 14, section 3(b) was an exculpatory clause; (3) that clause did not apply to trustees' establishing their own fees; (4) Holman was not protected by the exculpatory clause he had drafted; (5) Holman had not acted in good faith when he relied on his own legal opinion on his fees and when he set and took those fees. The court expressly analyzed and applied the *Powell* decision.

In two judgments, Holman was required to reimburse the trusts for the excess fees, as well as interest and attorney's fees. In the first judgment, the principal amount was $392,505.40. Interest to judgment date was $103,834.23. Costs were $581.05. The total, $496,920.68, bears annual interest at 13.64 percent. Clerk's Papers, at 218. In the second judgment, attorney's fees were assessed at $139,247.75 and costs at $15,166.92. The total, $154,414.67, bears inter-

est at 12.48 percent. Clerk's Papers, at 31.

The trial court incorporated the above findings in the removal case which followed 4 months later. At that time, the court found that Holman had breached his fiduciary duty by (1) charging excessive fees, (2) interfering with his client's (and trust beneficiary), the American Heart Association's, inquiry into his fee, (3) attempting to increase Seattle–First's trustee's fee to justify his own, (4) agreeing with some of Seattle–First's investment decisions to gain acceptance of his fee, (5) seeking to remove the CRAT's from the bank's "D" fund to increase his management role and, thus, his fees, (6) rendering a legal opinion on his own fee, (7) knowingly charging a fee in excess of a "normal" fee, and (8) allocating 80 percent of his fee to principal to avoid the objections of Beneficiaries.

The court also found that, while unacceptable hostility did not presently exist between Holman and Seattle–First, the potential for hostility was great because of "Mr. Holman's posture in conducting his defense." A similar condition was found to exist between Holman and Beneficiaries because of Holman's indicated "intent to bring libel and slander actions against various board members of the Charitable Beneficiaries and . . . to hire a private investigator to investigate various board members . . ." Finding of fact 3 (Removal Hearing); Clerk's Papers, at 40. Finally, the court determined that there existed conflicts of interest: (1) between Holman's role as a cotrustee of and as debtor to the Stuart trusts, (2) between Holman's role as a debtor in possession under Chapter 11 and as a judgment creditor as a Stuart trust trustee. As a court of equity, the court concluded that it had both the power and the duty to remove Holman, as cotrustee, because of his combined breaches of fiduciary duty and his resulting conflicts of interest.

Holman has appealed the trial court's findings and conclusions. Of the 41 issues he raises, this court need only address 14 and some of those issues will be examined together. The court must also consider three motions. For

those many issues based on factual findings we affirm the trial court and agree that they are supported by substantial evidence in the record. We do not need to expressly address them in this opinion.

# I
## THE FEE HEARING

The admissibility of expert testimony. Holman argues that Osborn's expert testimony, as a lawyer/cotrustee, should have been excluded because of surprise. Holman claims "severe prejudice" because he was not apprised of this new witness until the Friday before trial was to begin. Denied exclusion of testimony and permission to take Osborn's deposition, Holman settled for an interview with Osborn after the second day of trial. He claims that the interview inadequately prepared him to cross–examine Osborn or acquire a rebuttal witness.

Respondents counter with several arguments: (1) That the parties had agreed to notify each other "orally or by letter" at least by the Friday before trial, of any changes or additions in their list of possible experts. Apparently under the mistaken impression he had not received notice of Osborn's role until the day of trial, Holman acknowledged the above agreement. (2) That CR 26(b)(4)(A)(i) requires only that a party, upon request, identify its experts, the subject matter of their expected testimony, and "state the substance of the facts and opinions to which the [experts are] expected to testify and a summary of the grounds for each opinion". It is within the trial court's discretion, upon motion, to order further discovery by other means. (3) That Holman's attorney was allowed to interview Osborn prior to trial precluded prejudice.

With regard to alleged discovery violations, "it is an abuse of discretion to exclude testimony as a sanction absent any showing of intentional nondisclosure, willful violation of a court order, or other unconscionable conduct." *Smith v. Sturm, Ruger & Co.,* 39 Wn. App. 740, 750, 695 P.2d 600 (1985) (collecting cases); *accord, Lampard v.*

*Roth,* 38 Wn. App. 198, 202, 684 P.2d 1353 (1984). The trial court found no such intentional nondisclosure, nor does Holman allege such improprieties. The only testimony on the subject indicates that, until Friday afternoon, respondents did not know if and when Osborn could testify.

Respondents have not violated the discovery rule. If they had, however, it would have been error to have excluded the testimony. *See, e.g., Smith,* 39 Wn. App. at 750.

Whether Holman properly surcharged for the difference between the fees he received and the fees deemed appropriate by the trial court. Holman challenges the trial court's determination that he should refund all moneys he received in excess of reasonable compensation. He claims that, at most, he should be required to pay back only $78,105.08— his personal profit after deductions made for various office expenses resulting from his trustee service. He also argues that the trial court erred in requiring the surcharge because his fees were reasonable. Because this court finds the fees to be excessive, even without there being a breach of trust, Holman may still be properly surcharged for the excess, as he would be for any profit. *See* Restatement (Second) of Trusts § 203 (1959).

▇ Holman's argument ignores the reason for the surcharge; namely, to place Beneficiaries in the position they would have enjoyed but for the trustee's breach of trust. G. Bogert, *Trusts and Trustees* § 701, at 198 (rev. 2d ed. 1982). Notwithstanding the questionable character of many of Holman's office expenses, Holman cites no example of or authority for insulating office expenses from the excessive fee surcharge. As with most professional fees, a trustee's fee is calculated to cover overhead, as well as his time and expertise. A reasonable fee would therefore provide for an overhead allocation. Holman's argument is without merit.

Holman's other arguments against the surcharge are no more compelling. Holman claims that respondents' authority does not support a surcharge of trustee's fees later found unreasonable. Here, Holman fails to acknowledge or meet his burden, as appellant, to marshal authority for the

proposition that a surcharge may *not* be required of a trustee whose fees have been found excessive.

Holman also argues that, if his fees were unreasonable, then Seattle–First breached its duty by paying those fees. Holman apparently implies that it would be improper for Beneficiaries to release Seattle–First and allow the trust to pay Seattle–First attorney fees, while requiring Holman to restore those excess fees to the trust. Holman seems to imply that the release of Seattle–First somehow compromises Beneficiaries' claim against Holman. A more reasonable implication is that Holman may hold his cotrustee liable for damages suffered due to the cotrustee's alleged mismanagement. *See* 2 A. Scott, *Trusts* § 185 (3d ed. 1967).

The latter reading makes more sense in light of the use Holman makes of Seattle–First's alleged complicity. Holman seeks to avoid the surcharge by claiming he reasonably relied on Seattle–First's approval of the arrangement, evidenced by its payment of the negotiated and agreed on fee. For this reason he urges that, where an agreed upon fee is paid and later found unreasonable, the remedy should be prospectively applied. Holman, however, has not cross-claimed against Seattle–First for recovery of any of the surcharge. Whether he has waived his right to such recovery for any "reasonable reliance" on Seattle–First is not before this court and is not relevant to this appeal.

Finally, Holman alleges that the trial court failed to exercise any discretion in imposing the surcharge. This is based on the court's comment after determining the amount of a reasonable fee:

> In view of the Court's conclusion, the Court has *no choice* except to order that the defendant Holman return any fees in excess of that amount.

(Italics ours.) Report of Proceedings, at 17 (Sept. 7, 1984).

Even if this statement represents more than an unhappy choice of words, Holman has waived his right to appeal it by failing to challenge at trial the court's alleged misperception of its discretionary power. *See* RAP 2.5(a). Holman's various arguments on this issue are unconvincing.

The normalcy of Holman's fees. This section goes to the heart of the case. Holman's several challenges to the trial court's determination that his fees were excessive will be addressed serially.

Holman argues (1) that the trial court incorrectly interpreted the testator's term, "normal compensation", to mean "the established norm" and community custom; (2) that this interpretation foreclosed the court from determining whether his fees were reasonable, as he claims is required under *In re Powell,* 68 Wn.2d 38, 411 P.2d 162 (1966); (3) that conclusion of law 5.1 is error because it holds the *Powell* criteria to be inapplicable to individual cotrustees, even though *Powell* itself relies on a case specifically dealing with an individual cotrustee serving with a bank; and (4) that there exists no case law to support the factual finding that his fees should be limited to one–half of the Seattle–First fees.

Black's Law Dictionary defines "normal" as "not deviating from an established norm, rule, or principle; conformed to a type, standard or regular form; . . . regular; average . . ." Black's Law Dictionary 955 (5th ed. 1981). This definition alone would appear to justify a court's interpreting "normal compensation" to mean "the norm for compensation within the community." However, the findings of fact and oral opinion show that the court also applied the *Powell* criteria, urged by Holman, to the circumstances of the present case.

In *Powell,* this court set out the elements relevant to fixing a trustee's fee:

> (1) The amount of risk and responsibility involved, (2) the time actually required of the trustee in the performance of the trust, (3) the size of the estate, (4) the amount of income received, and (5) the manual and overall services performed.

*Powell,* 68 Wn.2d at 41.

The trial court's findings closely track the *Powell* analysis and language. *See* findings of fact 6.1.1–6.1.5 and 13 (Fee Hearing). Furthermore, in its oral opinion, the trial court

expressly applied the *Powell* factors, as well as its underlying authority, *In re Estate of Dunlap,* 38 Ariz. 525, 2 P.2d 1045 (1931), to the facts of this case. The trial court also properly acknowledged that the *Powell* court's identification of the maximum individual trustee fee (1.6 times the amount corporate trustee might charge) did not apply to a cotrustee, especially where, as here, the individual cotrustee assumed no administrative responsibilities and shared with the corporate trustee the risks and responsibilities of investment decisions. Hence, Holman misconstrues the import of conclusion of law 5.1 which only concluded that *Powell* does not govern the relationship between fees paid the corporate and individual cotrustees.

Appellants argue that findings of fact 6.1 and 12, that a "normal fee" for an individual cotrustee is, at most, 50 percent of a corporate cotrustee's fee, are not supported by case law. Findings of fact need not be supported by case law. They will be approved unless shown to be against the weight of the evidence. *Westland Constr. Co. v. Chris Berg, Inc.,* 35 Wn.2d 824, 832, 215 P.2d 683 (1950). Findings 6.1 and 12 are amply supported by the evidence in the record concerning a reasonable fee for an individual cotrustee of a comparable trust in the community.

While the evidence clearly supports the court's finding of "normal compensation," it should be noted that the general rule is that when there is more than one trustee, they divide one fee among them, and do not, in any event, charge the equivalent of two fees to one trust. *See, e.g., West Coast Hosp. Ass'n v. Florida Nat'l Bank,* 100 So. 2d 807 (Fla. 1958). This rule is succinctly stated in G. Bogert, *supra,* § 978, at 174:

> In the absence of statute, two or more trustees of the same trust are compensated according to the amount of services each has rendered, the whole sum paid the group amounting to what would have been paid a single trustee for like work.
>
> The single commission is not divided among them in proportion to the number of trustees, but on a quantum meruit basis.

(Footnotes omitted.)

The rationale for this rule is that the presence of two trustees should not, and does not, in any way enlarge or diminish the duty, responsibility and work of administering the trust: the assets, the investment judgment, the risk, the responsibilities, the accounting, the distribution of income, the other trustees' duties—in short, all the management and administration of that single trust—is the same whether there are 1, 2 or 10 trustees.

Holman's basic arguments about the court's use of *Powell* and interpretation of "normal compensation" are meritless. He raises them again, however, in a series of challenges to the court's application of or failure to apply *Powell*. These challenges can be summarily dismissed. While the trial court did not expressly find Holman's fee to be "unreasonable", declaring the fee to be "abnormal, excessive, and unjustified," would have to constitute a reasonableness finding.

The diminished responsibility of an individual cotrustee, challenged by Holman, has been partially discussed above. However, it should be noted that the corporate cotrustee is held to a higher standard of care because it represents itself as an expert in trust matters. Report of Proceedings, at 263 (July 24, 1984) (deposition of W. L. Schaumberg, manager of Rainier National Bank Trust Division). Holman, in contrast, expressly disavowed expert status and professed to rely heavily on the corporate trustee's "research and expertise." These admissions raise further questions about the appropriateness of Holman's setting up an office to duplicate Seattle–First's investment research. Holman's arguments are not persuasive.

The nature and applicability of the "good faith" provision. Holman claims the trial court erred in concluding (1) the "good faith" provision in the Stuart will was an exculpatory clause, rather than a power–embracing clause; (2) that the clause did not apply to Holman's fee–setting practice; and (3) that Holman could not rely on the clause because he was a drafter of the will. The reasons for deter-

mining why Holman's arguments lack merit need not be set forth because he has failed to overcome a more substantial obstacle.

There is more than sufficient evidence in the record to support the court's finding that Holman's setting and taking of the excessive fees was done in bad faith. In 1980, Holman received Sharon L. Dean's determination, which he had requested, that a reasonable fee would be .2 to .3 percent of the annual value of the trust. Holman, himself, testified that investment counseling firms would have charged .5 to .6 percent of the annual value. Early on, Mr. Blanchard, manager of the Charitable Trust Administration Section of Seattle–First National Bank, told Holman that his fee should be 50 percent of the bank's fee. The record is replete with evidence that Blanchard and others advised Holman that his fees were excessive and unreasonable. Further evidence of a lack of good faith was Holman's allocating 80 percent of his fee to trust principal in order to keep Beneficiaries from coming after him "like screaming eagles." He also encouraged his associate to bill more time to the trust to "justify" his fee. Several times he urged the bank to raise its fee to justify his own fee.

■ Substantial evidence supports the trial court's factual findings. Appellants' issues 6, 7, 10, 12, 15, 19, 20, 21, 22, 23, and 24 allege a lack of evidence to support various factual findings entered by the trial court in the fee hearing. In reviewing findings of fact entered by a trial court, an appellate court's role is limited to whether substantial evidence exists to support the findings. *Ridgeview Properties v. Starbuck*, 96 Wn.2d 716, 719, 638 P.2d 1231 (1982). "Substantial evidence" is evidence in sufficient quantum to persuade a fair–minded person of the truth of the declared premise. *Nichols Hills Bank v. McCool*, 104 Wn.2d 78, 82, 701 P.2d 1114 (1985).

We have examined the record and find the exhibits and testimony overwhelmingly support the trial court's factual findings. Holman's claims that the trial court "failed to consider" various issues are in error. Reference to the

record effectively rebuts these claims as well.

Holman's counsel does not respond to Beneficiaries' rebuttal of most factual issues, but does raise anew Holman's affirmative defenses of laches, estoppel and waiver. He claims there are no findings to support the trial court's conclusion that "Holman did not establish by any evidence his affirmative defenses of laches, waiver, [and] estoppel . . ." Finding of fact 14 (Fee Hearing). The waiver argument is unsupported in appellants' brief.

## A. Laches

Holman quotes Restatement (Second) of Trusts § 219(1), at 511, for the proposition that a beneficiary waives his rights against a breaching trustee if the beneficiary waits to sue "for so long a time and under such circumstances that it would be inequitable to permit him to hold the trustee liable." Holman then details several types of factors the court may consider in determining whether Beneficiaries' claims should be barred for laches. The factors focus on the length of Beneficiaries' delay after learning of the breach, the harm to the Beneficiaries, and the prejudice to the trustee because of the Beneficiaries' delay.

Holman claims that Beneficiaries knew of his fees almost 3 years before filing this action on April 11, 1983. Beneficiaries point out that they were first apprised of Holman's method of computing fees in a July 23, 1981 letter (exhibit 32) and that they began inquiring about those fees within 5 months thereafter. This is only 18 months after the time Holman claims Beneficiaries first received notice of his fees.

Our Court of Appeals has concluded that the standard by which disputed evidence is deemed "substantial" is "any reasonable view [that] substantiates [the trial court's] findings, even though there may be other reasonable interpretations." *Ebling v. Gove's Cove, Inc.*, 34 Wn. App. 495, 501, 663 P.2d 132 (1983).

The testimony, while conflicting, on the extent of Beneficiaries' notice of the fees, substantiates the court's finding that Holman did not carry his burden to prove the affirma-

tive defense of laches.

### B. Equitable Estoppel

Holman asserts this claim without explaining how the law of equitable estoppel applies to his case. It may refer to the bank's payment of his fees prior to this action. Holman never explains, however, how his reliance on the bank was reasonable given the bank's early refusal to approve his fees. As with its other findings, the trial court's finding on this issue is supported by substantial evidence in the record.

## II
### THE REMOVAL HEARING

*Due process and the use of Fee Hearing evidence in the removal hearing.* In his opening brief, Holman argues that the trial court should not have considered Fee Hearing evidence in the subsequent removal hearing. He argues that removal was not properly pleaded and that he was unfairly surprised when notified on the opening day of trial that the Attorney General sought his removal. The trial court, however, considered the request for removal to be "only a request for relief" and would address it only if the court concluded that removal might be appropriate. "[A]t that time the Court could allow the parties to present evidence . . . as to whether or not that's [removal] a harsh remedy not contemplated by Mrs. Stuart and so forth and so on." Report of Proceedings, at 20–21 (July 23, 1984).

Holman claims that he then asked for clarification as to whether he needed to respond if removal issues came up and the court agreed that he did not have to respond to such issues. Holman actually asked whether he needed "to respond to a removal case *now,* and if that comes up, [whether] it will be bifurcated in time, allowing me to get ready to prepare?" (Italics ours.) Report of Proceedings, at 27. Holman then appears to have waived his objections upon assurance that he would be granted a continuance, if the necessity arose, to prepare for a removal case. He concluded, "Then I will not address removal at all in this trial

now." Report of Proceedings, at 28.

▮ Even if Holman did not waive his objection, this was an action in equity. "When equity jurisdiction attaches, it extends to the whole controversy and whatever relief the facts warrant will be granted." *Haueter v. Rancich,* 39 Wn. App. 328, 331, 693 P.2d 168 (1984) (citing *Hubbell v. Ward,* 40 Wn.2d 779, 246 P.2d 468 (1952)). Holman concedes that Beneficiaries' complaint prayed "for such other relief as the Court may deem proper." Brief of Appellant, at 72. Finally, Holman "had four months (August 1984—December 1984) to prepare a defense to the removal case and had every opportunity during the removal hearing to recall any and all witnesses they wished to cross–examine with regard to evidence presented at the fee case." Brief of Respondents, at 82. That appellants chose not to take this action hardly provides a basis for a due process claim.

Whether Holman's bankruptcy creates a conflict of interest justifying his removal. Holman concedes the obvious that so long as he is required to reimburse the fees and interest, there exists a conflict in his roles as debtor and creditor of the trusts, which justifies his removal.

Whether findings constitute sufficient grounds for Holman's removal. Given the existing conflict we need not address the other grounds upon which the trial court relied to remove Holman from the trusteeship. However, we do agree that the other findings justify his removal. In his opening brief, Holman contends that only an "egregious breach of trust" will justify removal of a trustee. Brief of Appellant, at 83.

Findings 2.1 through 2.8 include Holman's taking of excessive and unjustified compensation (2.1); his interference with the American Heart Association (2.2); his wrongful attempts to increase the bank's fee in order to justify his own fee (2.3); his agreeing with the bank's investment decisions to gain favor as to his cotrustee's fee (2.4); his collection of his full fee for managing the CRAT's while they were in a bank common trust fund which required no investment advice on his part (2.5); his giving and then

attempting to use as a shield his legal opinion as to his own fee (2.6); his knowingly charging a fee in excess of a "normal" fee (2.7) and his allocation of his fee between principal and income to avoid the Beneficiaries' objections to the size of his fee (2.8). These constitute an egregious breach.

■ Holman does not address Beneficiaries' argument that the trial court's decision in a removal case will seldom be overturned "absent an abuse of discretion" (quoting *Citizens & Southern Nat'l Bank v. Haskins,* 254 Ga. 131, 327 S.E.2d 192 (1985) (citing G. Bogert, *supra,* § 527)). In a still frequently cited trustee removal case, the United States Supreme Court has stated that the basis for this discretion rests in an equity court's

> paramount duty to see that trusts are properly executed; and may properly be exercised whenever such a state of mutual ill–feeling, growing out of his behavior, exists between the trustees, or between the trustee in question and the beneficiaries, that his continuance in office would be detrimental to the execution of the trust, even if for no other reason than that human infirmity would prevent the cotrustee or the beneficiaries from working in harmony with him, and although charges of misconduct against him are either not made out, or are greatly exaggerated. . . .

*May v. May,* 167 U.S. 310, 320–21, 42 L. Ed. 179, 17 S. Ct. 824 (1897).

Even if Holman could convince this court to reverse some of the trial court's factual findings, the law will not support reversing the trial court's result. In fact, under *May,* even if Holman were to have completely prevailed on appeal, the bad will generated by the litigation would alone justify his removal.

Attorney General's standing. Holman argues that the Attorney General has no "supervisory and visitorial powers" over any of the Stuart trusts because the trusts are private trusts outside the scope of the charitable trust act. *See* RCW 11.110. While Holman's legal arguments are not without merit, they can be ignored because Holman expressly waived his objection to the Attorney General's

presence. See Report of Proceedings, at 122–23 (July 24, 1984).

Findings of fact in the "removal hearing." Holman challenges several factual findings made in the removal case. For the most part, the evidence overwhelmingly supports the trial court's findings. In all instances, there is, at least, substantial evidence in the record to support the trial court's findings.

## III
### ATTORNEY'S FEES

 Holman challenges the award of attorney's fees to Beneficiaries. The basis of his challenge is that the court erred in finding he had breached his fiduciary duty to Beneficiaries. Those arguments have been considered. The test for awarding fees in a trust case is "whether the litigation and the participation of the party seeking attorney fees caused a benefit to the trust." *Allard v. Pacific Nat'l Bank*, 99 Wn.2d 394, 407, 663 P.2d 104 (1983). Where the defendant has "breached [his] fiduciary duty plaintiffs should be granted their request to recover all attorney fees expended at both the trial and on appeal on behalf of the plaintiffs and all minor beneficiaries and unknown beneficiaries." *Allard*, 99 Wn.2d at 407–08.

Here, because the court affirms the trial court's finding that Holman breached his duty to Beneficiaries, the requested fees will be granted.

## IV
### MOTIONS CONSIDERED

Bank's motion. Seattle–First requests the following: (1) dismissal of this appeal and unconditional termination of review of this matter as it pertains to the bank; (2) an affirmation of the trial court's removal of Holman; and (3) judgment against Holman for Seattle–First's costs and attorney's fees.

While originally named as a defendant in this proceeding, Seattle–First settled with the plaintiffs before trial. The bank did appear at the removal hearing to argue for

Holman's removal because his individual status as judgment debtor to the trust conflicted with his trustee's role as judgment creditor on behalf of the trust. On April 10, 1985, Holman filed an amended notice of appeal (not found in the record) naming Seattle–First as a party. Holman's brief filed December 12, 1985, raises no assignment of error or legal issue that involves the bank.

Holman does not respond to this motion and there is no good reason to deny it. Holman gives no reason for having included the bank on appeal. His case appears frivolous with regard to the bank. Unable to discern *any* reason for Holman's having included the bank on appeal, the bank's theory seems credible that Holman is using the appeal process to delay execution on the judgments against him. We hold for the bank.

Holman's motions to correct and supplement the record. Holman states that plaintiff's second supplemental answers to Holman's second set of interrogatories and requests for admissions formally discloses Osborn's identity as an expert witness and was filed on the day of trial. Beneficiaries did not oppose this motion, noting only that Holman was made aware of Osborn's expert testimony 3 days before trial in accord with the parties' agreement. The motion is granted and does not affect the outcome of the case.

Holman also asks the court to accept a pleading filed May 9, 1986, in a separate, but related, case, Seattle–First National Bank v. General Accident Insurance Company and William & Emily Holman, King County cause 85–2–18236–7. The pleading, plaintiff's motion for partial summary judgment, involves the plaintiffs' counsel's characterization of the trial court's findings in the present case. Reflecting plaintiffs' counsel's interest in recovering insurance proceeds to compensate for Holman's pending bankruptcy, the characterization is more gentle to Holman than is the one found in Beneficiaries' brief to this court.

Beneficiaries request that the court deny this part of the motion. They point out that (1) the document is a pleading, not testimony or evidence; (2) that the document, by its

nature, could not have been before the trial court when it made its decision; and (3) that it does not meet the requirements of RAP 9.11 which provides:

(a) **Remedy Limited.** The appellate court may direct that additional evidence be taken before the decision of a case on review if: (1) additional proof of facts is needed to fairly resolve the issues on review, (2) the additional evidence would probably change the decision being reviewed, (3) it is equitable to excuse a party's failure to present the evidence to the trial court, (4) the remedy available to a party through postjudgment motions in the trial court is inadequate or unnecessarily expensive, (5) the appellate court remedy of granting a new trial is inadequate or unnecessarily expensive, and (6) it would be inequitable to decide the case solely on the evidence already taken in the trial court.

(b) **Where Taken.** The appellate court will ordinarily direct the trial court to take additional evidence and find the facts based on that evidence.

The remedy, RAP 9.11(b), underscores Beneficiaries' objection. If this court were to grant the motion, the trial court would be expected to reweigh all the testimony and evidence it had considered in light of a characterization of its original findings of fact. The motion is denied, any inconsistency between statements made in or about this case and the subsequent malpractice insurance case only raises collateral estoppel issues in the later case.

We affirm the trial court. We also grant Seattle–First's motion and Holman's first motion to supplement the record with plaintiff's answers to defendant's interrogatories. We deny Holman's second motion to supplement the record with pleadings from the separate malpractice insurance case.

PEARSON, C.J., BRACHTENBACH, ANDERSEN, GOODLOE, and DURHAM, JJ., and SKIMAS, J. Pro Tem., concur.

DORE, J. (concurring in part, dissenting in part)—I agree with the majority that Holman's fees were excessive and that he should be removed as cotrustee of the Stuart trusts.

I also agree that Holman should pay the attorney fees incurred by the plaintiffs and beneficiaries because of his breach of fiduciary duty to the trust. I believe that the majority errs, however, in granting the cotrustee, Seattle–First National Bank, its attorney fees on appeal. Majority, at 717–18.

Seattle–First was originally a defendant in this case, but settled with the beneficiaries prior to trial and at trial testified on their behalf. A judgment against Holman was entered in favor of the trust (in the name of the cotrustees) and Holman was removed as a cotrustee. Holman appealed both the judgment and his removal, and Seattle–First argues that it should not have been named as a respondent. Moreover, Seattle–First argues that the sole purpose of its being named a party to this appeal was to delay execution of the judgment, and pursuant to RCW 4.84.185 it should receive its attorney fees for the costs of answering this appeal. The majority grants those fees, which I believe is error.

RCW 4.84.185 sets forth the only grounds on which Seattle–First relies for this award:

> In any civil action, the court having jurisdiction may, upon final judgment and written findings by the trial judge that the action, counterclaim, cross–claim, third party claim, or defense was frivolous and advanced without reasonable cause, require the nonprevailing party to pay the prevailing party the reasonable expenses, including fees of attorneys, incurred in opposing such action, counterclaim, cross–claim, third party claim, or defense. This determination shall be made upon post–trial motion, and the trial judge shall consider the action, counterclaim, cross–claim, third party claim, or defense as a whole.

This statute does not authorize the granting of fees for appellate court decisions, and cannot be a justification for this court to award Seattle–First the costs of this appeal. Thus, the majority awards attorney fees to Seattle–First without authority.

Furthermore, Seattle–First argues that the only purpose

in its being named a party on appeal was to prevent it from executing its judgment (as cotrustee) against Holman. This is incorrect. RAP 8.1 states that a party may delay execution of judgment by filing of a supersedeas bond. Failure to file such a bond allows a successful party to execute on its judgment in all but a few cases not relevant here. Holman has not filed such a bond. Seattle–First was free at all times to execute on the original judgment.

Therefore, I would not allow the bank to recover over $4,000 in attorney fees for the cost of this appeal. Seattle–First has not advanced any theory which would justify such an award, and has not presented any argument as to why Holman is using this appeal solely as a vehicle for delay. I would deny Seattle–First attorney fees for this appeal.

HAMILTON, J. Pro Tem., concurs with DORE, J.

Reconsideration denied May 19, 1987.