[No. 20578-5-II. Division Two. July 10, 1998.]
RONALD E. ARMSTRONG, ET AL., *Appellants*, v. THE STATE OF WASHINGTON, ET AL., *Respondents*.

---

*Joseph L. Coniff, Jr.*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Matthew A. Love, Assistant*, for respondents.

HOUGHTON, C.J. — Ronald and Melvin Armstrong (the Armstrongs) filed a class action lawsuit against the Depart-

ment of Fish and Wildlife (Department)[1] seeking to enjoin enforcement of a regulation requiring modern gun hunters to wear fluorescent orange clothing while hunting. The Armstrongs argued that the Department did not have statutory authority to adopt and enforce the regulation. The trial court denied class certification and preliminary injunctive relief. The Armstrongs appeal from the superior court's ruling that the regulation was valid. We hold that the Department acted within its delegated authority in promulgating the regulation, and therefore affirm.

## FACTS

In November 1993, a Department enforcement officer issued Ron Armstrong a citation for failing to wear hunter orange clothing in violation of WAC 232-12-055.[2] A Grays Harbor district court judge dismissed the criminal proceeding, ruling that the Department lacked the authority to

---

[1] WAC 232-12-055 was originally adopted by the Wildlife Commission, as part of the Department of Wildlife. In 1994, the Department of Wildlife and the Department of Fisheries were combined into one agency, the Department of Fish and Wildlife. The previously enacted regulations of the two departments continued after the merger. RCW 43.300.010. Our references to the Department of Fish and Wildlife encompass the earlier Wildlife Commission, the earlier and current Department of Wildlife, and the current Fish and Wildlife Commission.

[2] WAC 232-12-055 provides:

(1) Except as authorized in section (4), it is unlawful to hunt upland birds or rabbits during any upland game bird season unless the hunter is wearing fluorescent hunter orange clothing.

(2) It is unlawful to hunt deer or elk during the modern firearm seasons in any manner unless the hunter is wearing fluorescent hunter orange clothing.

(3) It is unlawful to hunt bear, bobcat, raccoon, fox, coyote, rabbit, forest grouse or hare during those times and in those places open to the taking of deer or elk during a modern firearm season, unless the hunter is wearing fluorescent hunter orange clothing.

(4) Persons who are hunting upland game birds during an upland game bird season with a muzzleloading firearm, bow and arrow or falconry are not required to wear fluorescent hunter orange clothing.

(5) Wearing fluorescent hunter orange clothing means: A minimum of 400 square inches of fluorescent hunter orange exterior clothing, worn above the waist and visible from all sides.

adopt the regulation. The Superior Court upheld the District Court's decision on appeal.

The Department then adopted a policy *not* to enforce the hunter orange regulation in Grays Harbor County, although the Department urged residents to continue wearing hunting orange when hunting. The Department did not alter enforcement of the regulation for the rest of the state.[3]

The Armstrongs filed a class action lawsuit seeking injunctive relief enjoining enforcement of the hunter orange regulation.[4] Specifically, they challenged the Wildlife Department's authority to require hunter orange clothing under WAC 232-12-055. Upon cross-motions for summary judgment, the trial court issued an oral ruling declaring the regulation was constitutional and a proper exercise of the agency's authority.

## Trial Court's Decision and Reasoning

The trial court relied upon *Hartman v. State Game Comm'n*, 85 Wn.2d 176, 532 P.2d 614 (1975), in determining that the regulation was correctly promulgated.[5] According to *Hartman*, a court determines the extent of regulatory authority granted by determining the legislative intent as derived from the supporting statute and prefatory language. Using these standards, the trial court noted that RCW 77.12.010[6] and 77.12.040,[7] when read together, signify

---

[3]During the 1995 legislative session, the Department supported the adoption of SB 5171 codifying the hunter orange regulation as statute. The Legislature did not pass the bill.

[4]The trial court denied the request for class certification and preliminary injunctive relief. These issues are not raised on appeal.

[5]The trial court also ruled that the State was not collaterally estopped from enforcing the hunter orange regulation because of the dismissal of Ron Armstrong's prior criminal prosecution. This issue is not raised on appeal.

[6]RCW 77.12.010, Policy of protection of wildlife, provides in pertinent part that:

Wildlife is the property of the state. The department shall preserve, protect, and perpetuate wildlife. Game animals, game birds, and game fish may be

that the "manner of taking" is not limited to the method by which an animal is killed. According to the trial court, the "plain meaning" of the "manner of taking encompasses more than just the method used for killing wildlife."

The trial court also determined that the Legislature intended to expand the Department's rule-making power by amending RCW 77.12.010 to include the phrase "maximizes public recreational opportunities," which, the court stated, "constituted a broad expansion of the Commission's rule-making power." Under this "broad grant of discretion" to implement regulations, the court ruled that the Department has the right to regulate for public safety and the hunter orange requirement was "in every sense a proper rule."

The trial court accordingly granted summary judgment in favor of the Department. The Armstrongs appeal.

## ANALYSIS
### *Promulgation of the Rule*

In adopting the hunter orange regulation, WAC 232-12-055, the Department issued a statement of the regulation's purpose. The Department explained that the agency adopted this rule in response to a statistically high number of firearm-related hunting accidents in Washington occurring because of misidentification and other vision-related

---

taken only at times or places, or in manners or quantities as in the judgment of the commission *maximizes public recreational opportunities* without impairing the supply of wildlife.

(Emphasis added.)

[7]RCW 77.12.040, Regulating the taking or possessing of game, provides in pertinent part that:

The commission shall adopt, amend, or repeal, and enforce reasonable rules prohibiting or governing the time, place, and *manner of taking or possessing game* animals, game birds, or game fish. The commission may specify the quantities, species, sex, and size of game animals, game birds, or game fish that may be taken or possessed. The commission shall regulate the taking, sale, possession, and distribution of wildlife and deleterious exotic wildlife. The director may adopt emergency rules under RCW 77.12.150.

(Emphasis added.)

causes.[8] According to the Department, these types of accidents comprise the majority of firearm-related hunting accidents, and so the use of fluorescent hunter orange clothing "serve[s] as a valuable aid in increasing hunter visibility while in the field." In the Department's view, the hunter orange requirement will reduce these types of firearm-related accidents, a conclusion that is supported by evidence of fewer similar accidents occurring in other states following the implementation of similar regulations.

The Armstrongs contend that neither express nor implied statutory authority supports the Department's hunter orange regulation. They assert that reference to the subject of hunter safety is "conspicuously absent" from the Department's statutory authority and cannot be implied as necessary to effectuate its duties.

There is no express reference to safety in either RCW 77.12.010 or RCW 77.12.040. Thus, we must determine whether "manner of taking" read in connection with "maximizes public recreational opportunities" grants the Department an implied power to regulate hunter safety by requiring hunters to wear fluorescent orange.

■ The extent of the Department's rule-making authority is a question of law reviewed de novo. *Local 2916 IAFF v. Public Employment Relations Comm'n*, 128 Wn.2d 375, 379, 907 P.2d 1204 (1995). A party asserting the regulation's invalidity bears the burden of proving that the action was invalid. RCW 34.05.570(1)(a). The regulation is invalid if the court concludes the rule either: (1) violates constitutional provisions; (2) exceeds the agency's statutory authority; (3) was adopted without compliance to statutory rule-making procedures; or (4) that it could not have been the product of a rational decision-maker. RCW 34.05.570(2)(c); *Neah Bay Chamber of Commerce v. Department of Fisheries*, 119 Wn.2d 464, 469, 832 P.2d 1310 (1992).

■ Furthermore, where the Legislature has specifi-

---

[8]"Vision-related" accidents refer to accidents, for example, where the victim was in the line of fire or was "covered by shooter swinging on game."

cally delegated rule-making authority to an agency, the agency's regulations are presumed valid, and only compelling reasons demonstrating that the regulation conflicts with the intent and purpose of the legislation warrant striking down a challenged regulation. *Anderson, Leech & Morse, Inc. v. State Liquor Control Bd.*, 89 Wn.2d 688, 695, 575 P.2d 221 (1978); *Converse v. Lottery Comm'n*, 56 Wn. App. 431, 435, 783 P.2d 1116 (1989); *see also, Baker v. Snohomish County Dept. of Planning & Community Dev.*, 68 Wn. App. 581, 589, 841 P.2d 1321 (1992) (administrative regulations presumed valid and given great weight), *review denied*, 121 Wn.2d 1027 (1993). Thus, the regulation will be upheld if reasonably consistent with the statute being implemented. *In re Personal Restraint of Myers*, 105 Wn.2d 257, 264, 714 P.2d 303 (1986); *Keene v. Board of Accountancy*, 77 Wn. App. 849, 854, 894 P.2d 582, *review denied*, 127 Wn.2d 1020 (1995); *Gugin v. Sonico, Inc.*, 68 Wn. App. 826, 829, 846 P.2d 571 (1993). The wisdom or desirability of the rule is not a question for the court's review, *Federated Am. Ins. Co. v. Marquardt*, 108 Wn.2d 651, 655, 741 P.2d 18 (1987), although the court's purpose is to ascertain and give effect to the Legislature's intent. *Hartman*, 85 Wn.2d at 179.

■ To this end, the declaration of purpose is an important guide to understanding the breadth of authority the Legislature has delegated to the Department. *Id.* at 179; *State v. Alvarez*, 74 Wn. App. 250, 258, 872 P.2d 1123 (1994), *aff'd*, 128 Wn.2d 1 (1995); *see also, Spokane County Health Dist. v. Brockett*, 120 Wn.2d 140, 151, 839 P.2d 324 (1992) (statement of intent can be crucial to interpretation of statute). Thus, if an operative statute can be construed in a manner consistent with its broad statement of purpose, it should be so construed. *Belgarde v. Brooks*, 19 Wn. App. 571, 575-76, 576 P.2d 447 (1978); *see also Bennett v. Hardy*, 113 Wn.2d 912, 784 P.2d 1258 (1990) (in resolving a question of statutory construction, court adopts interpretation that best advances the legislative purpose).

■ ■ Here, the Legislature charged the Department

with two duties: (1) the duty to "preserve, protect, and perpetuate" the State's wildlife resources; *and* (2) the duty to "maximize" hunting and fishing "recreational opportunities." RCW 77.04.055(1)(b) and 77.12.010. The Legislature also granted the Department authority to adopt and enforce "reasonable rules prohibiting or governing the time, place, and manner of taking or possessing game animals." RCW 77.12.040. The Department's authority includes powers that are expressly delegated by statute and those necessarily implied from statutory grants of authority. *Anderson*, 89 Wn.2d at 694; *ASARCO, Inc. v. Puget Sound Air Pollution Control Agency*, 51 Wn. App. 49, 53, 751 P.2d 1229 (1988), *aff'd*, 112 Wn.2d 314 (1989). Appropriate rules may be adopted to "fill in the gaps" in legislation if such rules are "necessary to the effectuation of a general statutory scheme." *Hama Hama Co. v. Shorelines Hearings Bd.*, 85 Wn.2d 441, 448, 536 P.2d 157 (1975) (internal quotes omitted); *Kueckelhan v. Federal Old Line Ins. Co.*, 69 Wn.2d 392, 404, 418 P.2d 443 (1966) (Legislature may delegate powers to administrative agencies "to fill up the details and to make rules and regulations") (internal quotes omitted).

*Statutory Construction and Context*

██ ██ Neither "manner" nor "taking" is specifically defined in the Department regulations or statutes governing hunting. When words are not defined by statute, the court may refer to dictionary definitions and to common usage in light of the context in which the word is used. *Mustappa v. Department of Fisheries*, 67 Wn. App. 790, 793, 840 P.2d 235 (1992).

The Department urges us to define "manner" as "a way of doing something or the way in which a thing is done or takes place" and "takes" as "to catch or get . . . by killing." The Armstrongs emphasize that "taking" is the operative word and provide a similar definition for "taking."

██ We agree with the trial court that "manner of tak-

ing," when read together with "maximiz[ing] public recreational opportunities," connotes more than just killing game. The plain meaning of the words suggests the definition encompasses not only the method of killing, but also the "manner" of hunting in general. The "manner" of hunting involves the way in which hunting is conducted, which not only includes the physical act by which a hunter kills an animal, but also supervision and oversight of the hunter's conduct relative to other hunters within the surrounding vicinity engaged in similar activity.

■ Further, in determining the meaning of a word used in a particular instance, we consider the subject matter within which the word is used and the statutory context in which it appears. *State v. Garrison*, 46 Wn. App. 52, 54-55, 728 P.2d 1102 (1986); *see also, State v. Smith*, 48 Wn. App. 33, 35, 737 P.2d 723 (1987) (questionable term not looked at in vacuum; rather, statute is construed in context to determine word's meaning), *aff'd*, 111 Wn.2d 1 (1988); *Hartman*, 85 Wn.2d at 179 (look to statutory context as a whole to derive legislative intent).

In this regard, we note that the Department's supervision of and concern for hunter safety as an implied agency power is consistent with other statutes and regulations regarding wildlife and game. *See, e.g.*, RCW 77.16.070 (prohibition against hunting while intoxicated); RCW 77.32.155 (requiring hunting education program for hunting license, which includes instruction on safety); RCW 77.32.197 (requirement for training program for trappers, which includes instruction on trapper safety); WAC 232-12-054 (safety regulations regarding bow and arrow hunting); WAC 232-12-227 (hunter education training program requirements, which include instruction on safety); WAC 232-12--807 (Department operations and procedures include the responsibilities of the information and education division that is charged with planning and development of hunter education and safety training). These statutes and regulations imply that the Department has the authority to ensure that hunting is conducted safely. They indicate that

the Department may be properly concerned for the safety of the hunter as well for other hunters and individuals within the hunting area.

## Case Law

Both parties discuss *Northwest Gillnetters Ass'n v. Sandison*, 95 Wn.2d 638, 628 P.2d 800 (1981), *Puget Sound Gillnetters Ass'n v. Moos*, 92 Wn.2d 939, 603 P.2d 819 (1979); and *Hartman*, 85 Wn.2d 176. These cases, however, are inapplicable.

As the State properly notes in its brief and as the trial court observed, *Hartman v. State Game Commission* was decided before the statement of purpose was amended in 1977 to include "maximiz[ing] public recreational opportunities" as a departmental goal. Thus, we agree with the trial court that *Hartman* was "severely limited . . . [to] the conservation limitation." After *Hartman*, the Legislature expanded the commission's power and granted the agency broad discretion in implementing rules which "maximize" recreational opportunities. Therefore, *Hartman* is not helpful for the present analysis.

Furthermore, both *Northwest Gillnetters* and *Puget Sound Gillnetters* cited *Hartman*, which, as discussed above, did not involve interpretation of RCW 77.12.010 as amended after the *Hartman* decision. Those cases addressed challenges to agency rules enacted under the Fishery Code, RCW 75. Although the cases referred to RCW 77.12.010, neither focused on the amended language of RCW 77.12.010, namely, the additional directive to "maximize[] public recreational [hunting] opportunities."

More on point is *RSB v. State*, 632 So. 2d 24 (Ala. Crim. App. 1993), where the court addressed a challenge to the authority of the Alabama Department of Conservation and Natural Resources to require hunter orange clothing using an agency regulation. The Alabama regulation was based upon statutes similar to ours. In pertinent part, the Ala-

bama statutes provided that the state agency's duties were to "protect, conserve and increase the wildlife of the state," and that it had the authority to "regulate the manner, means and devices for catching or taking game." ALA. CODE § 9-2-2(1); § 9-2-7(a)(6).

 Based upon these statutes and the Alabama Department of Conservation and Natural Resource's general authority to promulgate rules to implement its statutory directives, the *RSB* court held that the department commissioner "did not exceed his authority when he enacted the 'hunter orange' requirement for hunters." *RSB*, 632 So. 2d at 28. According to the court, the adoption of a hunter orange rule was "consistent" with the underlying statutes. *RSB*, 632 So. 2d at 28. *See also State v. Swartzentruber*, 52 Ohio Misc. 2d 1, 556 N.E.2d 531, 532 (1989) (regulation requiring wearing of hunter orange "relates to the manner in which deer may be hunted, or taken").[9]

Based upon the statutory context of the hunter orange regulation and based upon case law discussed above, the regulation is reasonably consistent with the Department's statutory directives. Courts have long recognized that the Legislature may enact statutes in broad outline, leaving to administrative agencies the duty to arrange the details of the statute's effectuation and enforcement. *See Kueckelhan*, 69 Wn.2d at 404. Regulating hunter safety, thus, is an implied power that is necessary to the Department's effectuation of its duty to maximize public hunting recreational opportunities, a responsibility which the Legislature left in broad scope to the Department's discretion and

---

[9]The Armstrongs submit, without supporting authority, that by failing to pass SB 5171, the Legislature decidedly disapproved authority for regulating hunter safety. But the Legislature may have refused to pass SB 5171 for a number of reasons. For instance, failing to pass the bill may indicate legislative acquiescence in the agency's interpretation of the statute. *See Manor v. Nestle Food Co.*, 131 Wn.2d 439, 445 n.2, 932 P.2d 628, 945 P.2d 1119 (1997), *cert. denied*, 118 S. Ct. 1574 (1998). This is especially true when the Legislature has amended the statute in other respects without repudiating the administrative construction. *Id.* at 445 n.2.

oversight.[10] *See Equal Employment Opportunity Comm'n v. Tennessee Wildlife Resources Agency*, 696 F. Supp. 1163, 1179 (M.D. Tenn. 1986) (duties of wildlife officers in protecting public safety properly included prevention of hunting accidents by enforcing hunter orange requirement), *rev'd on other grounds*, 859 F.2d 24 (6th Cir. 1988), *cert. denied*, 489 U.S. 1066 (1989).

The requirement for hunter orange clothing is a functional and necessary component of safely hunting wildlife. *See Durango Herald, Inc. v. Riddle*, 719 F. Supp. 941, 951 n.9 (D. Colo. 1988) (bright orange hunting clothes are functional and appropriate for hunter safety). As the Department reasons, wearing hunter orange reduces the risks and dangers involved in hunting, effectively decreasing the number of accidental deaths. Requiring hunters to wear such highly visible clothing is a reasonable means to ensure that hunters make their presence known to other hunters, a requirement that serves to protect both the hunter donning the hunter orange clothing and other hunters in the vicinity. *See State v. Bontrager*, 114 Ohio App. 3d 367, 683 N.E.2d 126, 131-32 (Ct. App. 1996) (hunter orange regulation is a valid protective measure which protects hunters by making them more visible to other hunters; the regulation helps the state prevent accidental shootings and serves to protect public health and safety); *Watson v. State Farm Fire & Cas. Ins. Co.*, 459 So. 2d 1235, 1238 (La. Ct. App. 1984) (hunters owe a duty to themselves to prevent accidental shootings by making their presence known to other hunters, which is easily accomplished by wearing highly visible clothing), *rev'd on other grounds*, 469 So. 2d 967 (La. 1985). Without the authority to ensure that hunting is conducted in a safe manner, the Department could not carry out its duties as required by statute. The regulation is reasonably consistent with the statutory scheme pursuant to which the Department enacted the regulation, and the trial court did not err.

---

[10]We also note that safe hunting is also consistent with the Department's other statutory mandates which include encouraging hunting opportunities for the disabled and youth.

Affirmed.

MORGAN and ARMSTRONG, JJ., concur.

Reconsideration denied August 11, 1998.

Review denied at 137 Wn.2d 1011 (1999).