# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| MARIA E. ROMERO,<br><br>     Appellant,<br><br> v.<br><br>STATE OF WASHINGTON<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>     Respondent.<br>BERHANU AYELE,<br><br>     Appellant,<br><br> v.<br><br>STATE OF WASHINGTON<br>DEPARTMENT OF SOCIAL AND<br>HEALTH SERVICES,<br><br>     Respondent. | No. 58113-2-II<br><br><br><br>PUBLISHED OPINION |

GLASGOW, C.J.—Maria Romero and Berhanu Ayele were both owners of adult family homes who held Department of Health credentials to practice as nursing assistants. After finding that Romero and Ayele had each neglected a vulnerable adult, the Department of Social and Health Services (DSHS) placed their names on its vulnerable adult abuse registry.

DSHS's regulations only allow nursing assistants with a single finding of neglect that occurred in a nursing facility or skilled nursing facility to petition for removal from the registry.

No. 58113-2-II

Nursing assistants with a single finding of neglect that occurred in another setting are not eligible for removal. As a result, when Romero and Ayele petitioned for removal, DSHS denied their requests without a hearing or any other proceedings.

The nursing assistants then petitioned the trial court for judicial review of the regulations governing vulnerable adult abuse and neglect investigations, as well as DSHS's refusal to consider their petitions for removal. The trial court certified direct review to this court.

The nursing assistants argue that DSHS exceeded its statutory authority, that DSHS's regulations violated the due process and equal protection clauses of the Fourteenth Amendment to the United States Constitution, that DSHS's regulations are arbitrary and capricious, and that DSHS took arbitrary and capricious actions by refusing to consider the merits of their petitions for removal.

We hold (1) DSHS did not exceed its statutory authority, (2) under current Washington Supreme Court precedent, DSHS's regulations did not violate procedural due process, (3) the regulations did not violate substantive due process or equal protection, and (4) the regulations are not arbitrary and capricious. In addition, DSHS did not take arbitrary or capricious actions in Romero and Ayele's cases. We affirm.

FACTS

I. BACKGROUND ON VULNERABLE ADULT ABUSE AND NEGLECT INVESTIGATIONS

In 1999, the legislature enacted the "Abuse of Vulnerable Adults Act," chapter 74.34 RCW. The legislature found that some adults may be vulnerable to "abuse, neglect, financial exploitation, or abandonment by a family member, care provider, or other person who has a relationship with the vulnerable adult." RCW 74.34.005(1). The legislature further found that DSHS "must be

2

prepared to receive reports" of abuse or neglect and "provide protective services" to vulnerable adults. RCW 74.34.005(5)-(6), .020(5).

A.      Investigation of Abuse or Neglect

When there is reason to believe a vulnerable adult has experienced abuse or neglect, mandated reporters must, and permissive reporters may, report the instance of potential abuse or neglect to DSHS. RCW 74.34.035(1), (6). DSHS then initiates a response and notifies "the proper licensing authority" if the report alleges that the person who committed abuse or neglect was "professionally licensed, certified, or registered," such as a nursing assistant[1] who is certified or registered through the Department of Health. RCW 74.34.063(1), (6).[2]

Under RCW 74.34.068(1), once DSHS completes its investigation, it must "notify the alleged perpetrator regarding the outcome." RCW 74.34.068(3) authorizes DSHS to "adopt rules necessary to implement this section." RCW 74.34.165 similarly states that DSHS may "adopt rules relating to the reporting, investigation, and provision of protective services in in-home settings, consistent with the objectives of this chapter." The chapter does not define "in-home settings."

B.      Initial and Final Substantiated Findings

Chapter 388-103 WAC details what happens when Adult Protective Services, a division of DSHS, makes an initial substantiated finding of abuse or neglect. An "initial substantiated finding"

---

[1] A "nursing assistant" is "an individual, regardless of title, who, under the direction and supervision of a registered nurse or licensed practical nurse, assists in the delivery of nursing and nursing-related activities to patients in a health care facility." RCW 18.88A.020(8). *See also* WAC 388-103-0001(11) (Department regulations on vulnerable adult abuse and neglect adopting chapter 18.88A RCW's definition of a nursing assistant).

[2] We cite to the current version of the statute because the relevant language has not changed.

is a finding that, "more likely than not, the alleged" abuse or neglect "occurred." WAC 388-103-0001(9).

After making an initial substantiated finding, Adult Protective Services must notify the alleged perpetrator in writing within 10 working days. WAC 388-103-0040(1). The "alleged perpetrator may request an administrative hearing to challenge" the finding. WAC 388-103-0090. The finding becomes a final substantiated finding if the administrative law judge "dismisses the alleged perpetrator's request for hearing" because, for example, they withdraw the request. WAC 388-103-0160(1)(b).

If after a hearing, "the administrative law judge . . . finds that the preponderance of the evidence supports the initial substantiated finding," they must uphold that finding "in an initial order." WAC 388-103-0140(1). If either the alleged perpetrator or DSHS disagrees with the initial order, either party may request review from DSHS's Board of Appeals. WAC 388-103-0150(1). If the Board of Appeals enters a final order upholding the initial substantiated finding, it becomes a final substantiated finding. WAC 388-103-0160(1)(d).

C.      Vulnerable Adult Abuse Registry

When an individual has a final substantiated finding against them, DSHS places identifying information about the individual on the vulnerable adult abuse registry. WAC 388-103-0170. DSHS can disclose the fact that the individual is on the registry "[u]pon request of any person." WAC 388-103-0200.

RCW 74.39A.056(3)[3] requires DSHS to maintain the registry, although the language only obligates DSHS to include "identifying information about long-term care workers," as opposed to

---

[3] We cite to the current version of the statute because the relevant language has not changed.

any individuals who commit abuse or neglect. "Long-term care workers" are "all persons who provide paid, hands-on personal care services for the elderly or persons with disabilities, including . . . all direct care workers in state-licensed assisted living facilities, enhanced services facilities, and adult family homes." RCW 74.39A.009(20)(a).[4] While this definition specifically excludes people employed by "[n]ursing homes," RCW 74.39A.009(20)(b), our record suggests that DSHS does add people who committed abuse or neglect while working in nursing facilities to the vulnerable adult abuse registry. *See* CP at 82, 132 (letters denying the nursing assistants' petitions for removal from the vulnerable adult abuse registry and explaining that "[i]n order to be eligible for name removal, the incident must have occurred in a nursing facility or skilled nursing facility").

If a provider is on the vulnerable adult abuse registry, they "may not be employed in the care of and have unsupervised access to vulnerable adults." RCW 74.39A.056(2)(a).

D.      Petitioning for Removal

DSHS will remove a perpetrator's name from the vulnerable adult abuse registry if it determines the final substantiated finding was erroneous, judicial review results in the finding being reversed or overturned, or the perpetrator passes away. WAC 388-103-0180(2).

Alternatively, some perpetrators can petition for removal. DSHS will only accept petitions for removal from nursing assistants who meet certain requirements. WAC 388-103-0210(2)-(3). Relevant to this case, the nursing assistant's final substantiated finding must have concerned "a singular occurrence of neglect" that occurred "in a nursing facility or skilled nursing facility," which does not include occurrences in adult family homes. WAC 388-103-0210(1).

---

[4] We cite to the current version of the statute because the relevant language has not changed.

Once DSHS accepts the petition for removal from the vulnerable adult abuse registry, "the petitioner must attend an in-person interview with" DSHS. WAC 388-103-0210(4)(b). After the interview, if DSHS determines that "the petitioner's employment and personal history does not reflect a pattern of abusive behavior or neglect," DSHS approves the petition and removes the petitioner's name from the vulnerable adult abuse registry. WAC 388-103-0210(4)(c)(i). "A petitioner does not have a right to an administrative hearing regarding any" action DSHS takes on a petition to be removed from the vulnerable adult abuse registry. WAC 388-103-0210(5)(d).

WAC 388-103-0210, which sets out the rules for petitioning for removal from the vulnerable adult abuse registry, states that it implements the Federal Nursing Home Reform Act of 1987 "regarding a singular occurrence of neglect in a nursing facility or skilled nursing facility." WAC 388-103-0210(1). The Federal Nursing Home Reform Act imposes requirements on states as prerequisites for nursing homes to receive reimbursement under Medicaid. *Anderson v. Ghaly*, 930 F.3d 1066, 1070 (9th Cir. 2019). Under the Act, a state must "establish a procedure to permit a nurse aide to petition" for removal from the state's registry if the State determines that the nurse aide's "employment and personal history . . . does not reflect a pattern of abusive behavior or neglect" and "the neglect involved in the original finding was a singular occurrence." 42 U.S.C. § 1396r(g)(1)(D)(i). In this context, a "nurse aide" is "any individual providing nursing or nursing-related services to residents" in a nursing facility or skilled nursing facility who is not a licensed health professional, registered dietician, or volunteer. 42 U.S.C. §§ 1395i-3(a)(5)(F), 1396r(b)(5)(F).

6

## II. FACTUAL BACKGROUND

A.     Romero

In 2017, Romero was a nursing assistant who owned an adult family home. That year, a vulnerable adult who lived in Romero's adult family home left the home by himself. He was not located until the next day, when he was found unharmed in police custody. The resident had a history of wandering, but Romero did not have a safety plan in place to prevent the resident from leaving without supervision.

After investigating the incident, DSHS sent Romero a letter notifying her of its finding that she neglected a vulnerable adult. Romero requested an administrative hearing to challenge the finding, but she ultimately withdrew her request. The Office of Administrative Hearings then dismissed the proceedings, and the finding became a final substantiated finding under WAC 388-103-0160(1)(b).

Once DSHS placed Romero on the vulnerable adult abuse registry, the Department of Health charged Romero with unprofessional conduct because the placement constituted "'a restriction of [her] license to practice [a] health care profession.'" Clerk's Papers (CP) at 60 (quoting RCW 18.130.180(5)). Romero and the Department of Health agreed to put Romero's credential to practice as a nursing assistant "on expired status, subject to renewal with conditions:" payment of a $250 fine and 4 hours of continuing education CP at 69-70.

In 2019, after finding that Romero had complied with the agreement, the Department of Health ordered that Romero was eligible for "a credential without conditions, limitations, and/or restrictions." CP at 76.

In 2021, Romero petitioned for removal from the vulnerable adult abuse registry. DSHS denied her request, explaining that because the incident of neglect "did not occur in a nursing facility or skilled nursing facility," Romero was "not eligible to petition for name removal" and would "permanently remain" on the registry. CP at 21.

B.    Ayele

Ayele was a nursing assistant who owned an adult family home. In 2018, a vulnerable adult at the home thought he heard someone trying to break in around 4:00 a.m. The resident "pressed his call button several times" and received no answer, so he called 911. CP at 111. When law enforcement and emergency fire department personnel responded, they did not see any staff members at the home. Ayele later explained that he was asleep upstairs and did not learn of the break-in concern until the next morning.

After DSHS made an initial substantiated finding of neglect against Ayele, he challenged the finding by requesting an administrative hearing and by later requesting that the Board of Appeals review the administrative law judge's initial order upholding the substantiated finding. The Board of Appeals affirmed and the finding became final.

Once DSHS placed Ayele on the vulnerable adult abuse registry, the Department of Health charged Ayele with unprofessional conduct. Ayele and the Department of Health agreed that Ayele's credential to practice as a nursing assistant would be suspended for at least one year, after which Ayele would be able to petition for reinstatement. Before petitioning, Ayele would have to pay a $250 fine and complete 6 hours of continuing education. The record does not contain information about the current status of Ayele's credential.

In 2021, Ayele petitioned for removal from the vulnerable adult abuse registry and received the same response Romero did: because the incident of neglect "did not occur in a nursing facility or skilled nursing facility," Ayele was "not eligible to petition for name removal" and would "permanently remain" on the registry. CP at 132.

## C.    Petitions for Judicial Review

Romero and Ayele separately petitioned the trial court for judicial review of the regulations governing vulnerable adult abuse and neglect investigations and DSHS's refusal to remove them from the registry. The trial court consolidated their cases.

The nursing assistants then moved for an order certifying their case for transfer to this court for direct review. The trial court granted the nursing assistants' motion.

## ANALYSIS

### I. STANDARDS OF REVIEW

When a party challenges agency rules or actions, we apply the standards of review outlined in the Washington Administrative Procedure Act, chapter 34.05 RCW directly to the agency's administrative record. *Washington Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 645, 62 P.3d 462 (2003); *Johnson Forestry Contracting, Inc. v. Dep't of Nat. Res.*, 131 Wn. App. 13, 19, 126 P.3d 45 (2005). The party challenging the agency rule or action bears the burden of demonstrating its invalidity. *Ports Ass'n*, 148 Wn.2d at 645; *Johnson Forestry*, 131 Wn. App. at 19.

A rule is invalid if the rule "violates constitutional provisions; the rule exceeds the statutory authority of the agency; the rule was adopted without compliance with statutory rule-making procedures; or the rule is arbitrary and capricious." RCW 34.05.570(2)(c). "We presume an

agency's regulations are constitutional." *Haines-Marchel v. Washington State Liquor & Cannabis Bd.*, 1 Wn. App. 2d 712, 736, 406 P.3d 1199 (2017). Additionally, where the legislature has specifically delegated rulemaking power to an agency, we presume its regulations are valid. *Id.*

The decision to reject the nursing assistants' petitions for removal from the registry occurred without an administrative hearing or other adjudicative proceeding. We will grant relief from an agency action other than an order in an adjudicative proceeding only if we determine that the action is unconstitutional, outside the agency's authority, arbitrary or capricious, or taken "by persons who were not properly constituted as agency officials lawfully entitled to take such action." RCW 34.05.570(4)(c)(i)-(iv).

## II. STATUTORY AUTHORITY

The nursing assistants argue that DSHS's regulations exceed its statutory authority. They argue that while chapter 74.34 RCW empowers DSHS to investigate abuse or neglect of vulnerable adult allegations, the chapter "does not provide . . . that a substantiated finding of neglect will ever become permanent and non-appealable, or that DSHS will create a registry of final findings that is available to the public." Appellants' Opening Br. at 49. And they argue that the chapter "contains no . . . limitation as to the nursing assistants or other persons who may petition for removal." *Id.* at 50.[5] We disagree.

---

[5] In its response, DSHS argued that aside from RCW 74.39A.901, which provides that rules under chapter 74.39A RCW must meet federal requirements for receiving federal funds, no statute permits a person with a final substantiated finding of abuse or neglect of a vulnerable adult to petition for removal from the vulnerable adult abuse registry *or* work with vulnerable adults. But at oral argument, DSHS acknowledged that the nursing assistants' appeal only addresses removal from the registry. And DSHS appeared to abandon the argument in this case that if a person has a final substantiated finding of abuse or neglect, they will not be able to work with vulnerable adults even if DSHS removes them from the registry.

10

If the legislature "has specifically delegated rule-making authority to an agency, . . . only compelling reasons demonstrating that the regulation conflicts with the intent and purpose of the legislation warrant striking down a challenged regulation." *Armstrong v. State*, 91 Wn. App. 530, 536-37, 958 P.2d 1010 (1998). Therefore, we will uphold a regulation if it is "reasonably consistent with the statute" it implements. *Id.* at 537.

Here, DSHS's regulations governing the registry do not conflict with the statutory scheme on abuse and neglect of vulnerable adults. First, contrary to the nursing assistants' arguments, the regulation does not make substantiated findings of neglect "permanent and non-appealable." Appellants' Opening Br. at 49. As explained above, DSHS can determine that a final substantiated finding is erroneous, and a court can reverse or overturn a final substantiated finding. WAC 388-103-0180(2). If either of those events takes place, DSHS removes an individual's name from the vulnerable adult abuse registry. *Id.*

Second, the challenged regulations do not conflict with RCW 74.39A.056(3),[6] the statute authorizing the vulnerable adult abuse registry. The statute provides that DSHS "shall establish, by *rule*, a state registry [that] contains identifying information about long-term care workers" against whom DSHS has made final substantiated findings of abuse or neglect. RCW 74.39A.056(3) (emphasis added). The statute's language authorizes DSHS to flesh out the details of the registry through rulemaking. It further provides that DSHS "*shall disclose*, *upon request*," the final substantiated findings "to *any person* so requesting this information." *Id.* (emphasis added). The language of the corresponding regulation is consistent: "*Upon request of any person*,

---

[6] We cite to the current version of the statute because the relevant language has not changed.

the [DSHS] *shall disclose* the identity of a person" on the vulnerable adult abuse registry. WAC 388-103-0200. There is thus no conflict between the statute and the regulation.

Third, while the nursing assistants are correct that the legislature did not explicitly limit the ability of any individual to petition for removal from the vulnerable adult abuse registry, the legislature also did not expressly require DSHS to create a petition process that applies to everyone. And the legislature expressly delegated to DSHS the task of establishing the registry's parameters through its rulemaking. The absence of a regulation broadly allowing petitions for removal does not demonstrate a conflict "with the intent and purpose of the legislation." *Armstrong*, 91 Wn. App. at 536-37.

In sum, the nursing assistants have not met their burden of demonstrating that DSHS's regulations exceed its statutory authority.

The nursing assistants also argue that DSHS erroneously interpreted and applied the law. They contend that, in adding them to the vulnerable adult abuse registry "but summarily rejecting their petitions for removal," DSHS erroneously applied chapter 74.34 RCW and the vulnerable adult abuse registry to them. Appellants' Opening Br. at 54-55. They do not provide further explanation. It is an appellant's responsibility to provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(6). "Appellate courts need not consider arguments that are unsupported by pertinent authority, references to the record, or meaningful analysis." *Cook v. Brateng*, 158 Wn.

App. 777, 794, 262 P.3d 1228 (2010). We therefore decline to address the nursing assistants' erroneous application argument.[7]

### III. FOURTEENTH AMENDMENT

#### A.     Procedural Due Process

The nursing assistants argue that DSHS's decision to prohibit them from petitioning to be removed from the vulnerable adult abuse registry violates their Fourteenth Amendment procedural due process rights. They argue that DSHS erred in summarily rejecting their petitions for removal from the registry without any individualized consideration of their merits.

DSHS responds that before a finding of abuse or neglect becomes final, a precursor to placement on the registry, the accused person has the "the opportunity for a full administrative hearing and judicial review to contest that finding." Resp't's Resp. Br. at 32. DSHS argues that process is sufficient, and due process does not require that everyone have access to additional procedures for obtaining removal from the registry. The nursing assistants reply that because DSHS has created a separate process for removal from the vulnerable adult abuse registry, that process must also "meet the requirements of due process." Appellants' Reply Br. at 3.

We hold that under current law established in *Fields v. Department of Early Learning*, DSHS has not violated the nursing assistants' procedural due process rights. 193 Wn.2d 36, 434 P.3d 999 (2019) (plurality opinion).

---

[7] In their reply brief, the nursing assistants seem to expand this argument to address an alleged inconsistency with federal law. But because this was raised for the first time in the reply, and they did not otherwise contend in their opening brief that federal law preempts the relevant regulation, we decline to address this argument further. *Cowiche Canyon Conservancy v. Bosley*, 118 Wn.2d 801, 809, 828 P.2d 549 (1992).

1.      Procedural due process principles

"The United States Constitution guarantees that federal and state governments will not deprive an individual of 'life, liberty, or property, without due process of law.'" *Amunrud v. Bd. of Appeals*, 158 Wn.2d 208, 216, 143 P.3d 571 (2006) (quoting U.S. CONST. amend. XIV, § 1). Pursuit "of an occupation or profession is a liberty interest protected by the due process clause." *Id.* at 219. "When a state seeks to deprive a person of a protected interest, procedural due process requires that an individual receive notice of the deprivation and an opportunity to be heard to guard against erroneous deprivation." *Id.* at 216.

To determine whether procedures that deprive a person of a protected interest "satisfy the requirements of the Fourteenth Amendment, we apply the balancing test from *Mathews v. Eldridge*." *In re De Facto Parentage of A.H.*, ___, Wn. App. ___, 536 P.3d 719, 727 (2023). Under *Mathews,* we balance three factors: (1) the protected interest at stake, (2) the risk that the procedures in place will cause an erroneous deprivation of that protected interest and the probable value of additional procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens the additional safeguards would impose. 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

In *Fields*, a five-justice majority held that there was no procedural due process violation where Department of Early Learning regulations permanently disqualified Fields from working at any Washington licensed childcare facility. 193 Wn.2d at 58 (Fairhurst, J., and three additional Justices dissenting); *id.* at 55 (Gordon McCloud, J., concurring with Justice Fairhurst's opinion on the procedural due process issue). The regulations provided that people with certain convictions were permanently barred from providing licensed childcare, and Fields had such a conviction. *Id.*

at 43. The "only procedural mechanism" Fields could use to challenge the validity of the disqualification was "judicial review pursuant to the Administrative Procedure Act." *Id.* at 45. The five-justice majority reasoned that there was no violation because procedural due process principles guarantee "only that individuals have notice and the opportunity to be heard to contest whether [a] rule does apply to them, not whether it should." *Id.* at 58 (Fairhurst, J., dissenting). *See also id.* at 55 (Gordon McCloud, J., concurring) (quoting the dissent for the same proposition). In contrast, the four-justice lead opinion concluded that the Department of Early Learning violated Fields' procedural due process rights. *Id.* at 51.

Fields' interest in pursuing her chosen profession and the government's interest in protecting children balanced each other out. *Id.* at 46. Focusing on the second *Mathews* factor, the lead opinion explained that Fields was entitled to "the additional protection of an individualized determination of her qualifications" to work in licensed childcare facilities, despite her conviction for attempted second degree robbery. *Id.* at 51.

The lead opinion reasoned that using Fields' decades-old conviction "as the sole basis for her permanent disqualification with no opportunity for an individualized determination [presented] an unusually high risk of arbitrary, erroneous deprivation." *Id.* at 49. It explained that the regulations treated Fields "identically to a person who [had] recently committed multiple acts of child abuse," and they gave "no weight" to Fields' circumstances at the time of her offense: she was four years into legal adulthood and struggling with substance use disorder, domestic violence, and persistent housing insecurity. *Id.* at 46-47. And it noted that the procedure on remand would not need to be "unusual or burdensome," as the Department of Early Learning "already [had]

15

regulations governing individual determinations of those with troubling past behavior but without any disqualifying convictions." *Id.* at 51.

The lead opinion also pointed out that the Department of Early Learning regulations were inconsistent with regulations governing foster care license eligibility. *Id.* at 48. At the time, the conviction that barred Fields from providing licensed childcare would not have barred her from becoming a foster parent, even though the risk of abuse from foster parents could arguably present greater dangers to children than the risk of abuse in licensed childcare facilities. *Id.*

Two federal cases addressing removal from similar registries provide persuasive authority. As in *Fields*, the outcomes of both cases turned on the risk of erroneous deprivation. *Humphries v. County of Los Angeles*, 554 F.3d 1170, 1200 (9th Cir. 2008), *reversed on grounds involving liability*, *Los Angeles County, Cal. v. Humphries*, 562 U.S. 29, 131 S. Ct. 447, 178 L. Ed. 2d 460 (2010); *Valmonte v. Bane*, 18 F.3d 992, 1004 (2d Cir. 1994).

In *Humphries*, a couple's child reported abuse. 554 F.3d at 1175. Although courts found the parents "'factually innocent' of the charges for which they had been arrested" and "dismissed all counts of the dependency petition as 'not true,'" California identified the parents "as 'substantiated' child abusers" and placed them on "a database of known or suspected child abusers." *Id.* The Ninth Circuit held that the "lack of any meaningful, guaranteed procedural safeguards before the initial placement . . . combined with the lack of any effective process for removal" violated the parents' procedural due process rights. *Id.* at 1200. The court reasoned that there was "too great a risk of individuals being placed on the [database] who [did] not belong there, and then remaining on the [database] indefinitely." *Id.* at 1200-01.

16

Similarly, in *Valmonte*, a woman challenged New York's registry of individuals who allegedly abused or neglected children. 18 F.3d 992, 994-95 (2d Cir. 1994). The Second Circuit held that the registry violated procedural due process principles. *Id.* at 1004. It reasoned that the state only had to prove allegations by "'some credible evidence'" to initially include a person on the registry or keep them on it after an administrative hearing, and it was "only later, . . . when the subject [had] already been denied employment due to . . . inclusion on the [registry], that the [state was] required to prove the allegations against the subject by a 'fair preponderance of the evidence.'" *Id.* at 1003, 1004. "The crux of the problem" was that "the 'some credible evidence' standard [resulted] in many individuals being placed on the list who [did] not belong there." *Id.* at 1004.

### 2. Right to an individualized determination

Here, as in *Fields*, *Humphries*, and *Valmonte*, our analysis focuses on the second *Mathews* factor, the risk of erroneous deprivation. The first and third *Mathews* factors are fairly straightforward. An individual's interest in pursuing their chosen profession without arbitrary government interference is significant and well-established. *Fields*, 193 Wn.2d at 43-44; *Amunrud*, 158 Wn.2d at 219; *Conn v. Gabbert*, 526 U.S. 286, 291-92, 119 S. Ct. 1292, 143 L. Ed. 2d 399 (1999). And it is undisputed that DSHS has a strong interest in protecting vulnerable adults and in avoiding excessive administrative burdens on the agency. *See Fields*, 193 Wn.2d at 46. Our analysis therefore focuses on the risk that DSHS's regulations will cause erroneous deprivations, as well as the probable value of additional procedural safeguards related specifically to removal from the registry.

The working conditions many nursing assistants face suggest that the risk of erroneous deprivation in this case is high. The direct care workforce—encompassing "workers who provide essential support services to the elderly and disabled"—"is primarily composed of low-income women, people of color, and immigrants." John D. Blum & Shawn R. Mathis, *Forgotten on the Frontlines: The Plight of Direct Care Workers During COVID-19*, 98 U. DET. MERCY L. REV. 325, 327, 329 (2021). "Almost half of [direct care workers] are employed part-time, where low wages and lack of benefits often force them to have multiple jobs." *Id.* at 329. Their work is "emotionally taxing," and the injury rates "are high due to the physical demands inherent in providing assistance with activities of daily living." *Id.* Direct care workers also frequently face "client aggression and violence, sexual harassment, and discrimination." *Id.* It is not surprising that under these difficult working conditions, mistakes can happen. Given the realities of direct care work, if DSHS individually considered the qualifications of nursing assistants with single findings of neglect, it is likely that, in many cases, it would determine that these single findings did not show an ongoing propensity for abusive or neglectful behavior.

Under the four-justice minority lead opinion's reasoning in *Fields*, DSHS's regulations would violate the nursing assistants' procedural due process rights. Like in *Fields,* there is no opportunity for an individualized determination as to whether a person has rehabilitated enough not to be an ongoing risk to vulnerable adults. 193 Wn.2d at 49. Among nursing assistants with single findings of neglect, only one factor determines access to an individualized determination of eligibility to work with vulnerable adults: the setting of the prior instance of neglect. This lack of a case by case evaluation, like in *Fields,* makes the risk of erroneous deprivation "unusually high." *Id.* at 49.

Furthermore, DSHS does not argue, and the record does not show, that nursing assistants who worked in nursing homes are really less likely to harm vulnerable adults. Thus, using the setting of the prior instance of neglect as the sole determining factor as to whether nursing assistants can petition for removal also significantly risks erroneous deprivation. *Fields*, 193 Wn.2d at 48-49. Moreover, like the Department of Early Learning in *Fields*, DSHS "already has regulations governing individual determinations of those with troubling past behavior" that occurred in nursing homes, so extending the petition process to nursing assistants like Romero and Ayele would not be "unusual or burdensome." *Id.* at 51. And there is another similarity to *Fields*, where a second degree robbery conviction barred a person from providing licensed childcare but not from becoming a foster parent. While DSHS *permanently* banned Romero and Ayele from working with vulnerable adults, the Department of Health only *temporarily* barred them from working as nursing assistants, even though working with people who are vulnerable in some way is an inherent part of the job. Thus, were we to apply the reasoning of the four-justice lead opinion in *Fields* to this case, we too would find a procedural due process violation.

But the five-justice *Fields* majority holding compels us to hold that there is no procedural due process violation here. DSHS's regulations operate similarly to the Department of Early Learning regulations that, under the majority in *Fields*, did not violate procedural due process principles. The DSHS regulations permanently disqualify the nursing assistants from working with vulnerable adults by making it impossible for them to be removed from the vulnerable adult abuse registry. As in *Fields*, the nursing assistants cannot obtain individualized determinations of their qualifications. And as in *Fields*, the disqualifications in this case occurred through the straightforward application of a rule, and the nursing assistants were able to challenge the validity

of the underlying finding of neglect through judicial review pursuant to the Administrative Procedure Act.

It is true that *Fields* did not address removal from a registry, but it is not possible to apply the lead opinion's reasoning about the deprivation of an individualized determination without running afoul of the five-justice majority opinion. And in *Humphries* and *Valmonte*, the courts found procedural due process violations partly because the procedures that led to placement on the registry were inadequate. In contrast, DSHS requires more proof of abuse or neglect before placing an individual on the vulnerable adult abuse registry. The standard of proof for an initial substantiated finding of neglect is preponderance of the evidence, and if an individual challenges the finding, DSHS must again prove that, more likely than not, the alleged abuse or neglect occurred. WAC 388-103-0001(9); WAC 388-103-0140.

In sum, the majority's reasoning in *Fields* is controlling. We therefore hold that under current law, DSHS did not violate the nursing assistants' procedural due process rights by prohibiting them from petitioning for removal from the registry.

B.    Substantive Due Process

The nursing assistants argue that DSHS's regulations were "unduly oppressive" of their substantive due process right to pursue their chosen profession because the regulations prohibited them "from ever petitioning for removal" from the vulnerable adult abuse registry. Appellants' Opening Br. at 46. They contend that the disproportionate impact of DSHS's "actions and rules bear no relation to a legitimate government interest." *Id.* at 47. We disagree.

The Fourteenth Amendment due process clause "'confers both procedural and substantive protections.'" *Nielsen v. Dep't of Licensing*, 177 Wn. App. 45, 52, 309 P.3d 1221 (2013) (quoting

*Amunrud*, 158 Wn.2d at 216). Substantive due process requires deprivations of life, liberty, or property to be substantively reasonable. *Id.* at 53. These "deprivations are constitutionally infirm if not 'supported by some legitimate justification.'" *Id.* (quoting Russell W. Galloway, Jr., *Basic Substantive Due Process Analysis*, 26 U.S.F. L. REV. 625, 625-26 (1992)).

Where, as here, a deprivation of life, liberty, or property does not affect a fundamental right, we apply rational basis review and require the challenged regulation to be rationally related to a legitimate government interest. *Id.*; *Garcia v. Dep't of Soc. & Health Servs.*, 10 Wn. App. 2d 885, 919, 451 P.3d 1107 (2019) (holding that a person's ability to work in the profession of their choosing is not a fundamental right). Still, "notwithstanding the strong presumption of constitutionality, the rational basis test 'is not a toothless one.'" *Nielsen*, 177 Wn. App. at 53 (internal quotation marks omitted) (quoting *Mathews v. De Castro*, 429 U.S. 181, 185, 97 S. Ct. 431, 50 L. Ed. 2d 389 (1976)).[8]

Here, DSHS articulates a rational basis for its regulation. First, DSHS has an undisputed interest in protecting vulnerable adults to the maximum extent possible. And as discussed in more detail below, DSHS also has a significant interest in maintaining the maximum available Medicaid funding, especially where this funding ensures care for Washington's vulnerable residents.

DSHS's regulations, which prevent some people on the vulnerable adult abuse registry from petitioning for removal, are rationally related to its legitimate interest in protecting vulnerable

---

[8] DSHS's brief seems to suggest that Division One's analysis in *Garcia* should inform our analysis of the due process issues in this case. Resp'ts Response Br. at 38. However, as DSHS acknowledges and the nursing assistants correctly point out, the *Garcia* appellants did not raise procedural or substantive due process claims. Resp'ts Response Br. at 40; Appellants' Reply Br. at 29; *Garcia*, 10 Wn. App. 2d at 922.

adults to the greatest extent possible. The nursing assistants have failed to establish a substantive due process violation in light of the legitimate justification offered for DSHS's regulations.

C.     Equal Protection

The nursing assistants argue that DSHS has violated the equal protection clause by creating "an irrational distinction between two classes of nursing assistants: those who committed neglect while they worked in" nursing homes "and those who committed neglect while they worked in other settings." Appellants' Opening Br. at 37.

DSHS responds that its regulations do not violate the equal protection clause because they "permit removal of only those people for whom removal is necessary to ensure the state receives federal Medicaid funding." Resp't's Resp. Br. at 44-45. The regulations therefore protect vulnerable adults as broadly as possible while still ensuring full Medicaid funding. We agree with DSHS.

The Fourteenth Amendment equal protection clause prohibits a state from denying "to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. "Equal protection requires that 'all persons similarly situated should be treated alike.'" *Am. Legion Post No.149 v. Dep't of Health*, 164 Wn.2d 570, 608, 192 P.3d 306 (2008) (internal quotation marks omitted) (quoting *O'Hartigan v. Dep't of Pers.*, 118 Wn.2d 111, 121, 821 P.2d 44 (1991)).

When evaluating a regulation under the equal protection clause, we determine "the appropriate level of scrutiny" based on "the nature of the classification or rights involved." *Id.* "If a suspect classification or fundamental right is not involved, rational basis review applies." *Id.* at 609. "[R]ational basis review is the appropriate standard for evaluating regulations affecting one's ability to work . . . in an occupation of one's choosing." *Garcia*, 10 Wn. App. 2d at 919. "So long

as the 'classification is neither capricious nor arbitrary, and rests upon some reasonable consideration of difference or policy, there is no denial of the equal protection of the law.'" *Forbes v. City of Seattle*, 113 Wn.2d 929, 944, 785 P.2d 431 (1990) (internal quotation marks omitted) (quoting *Allied Stores of Ohio, Inc. v. Bowers*, 358 U.S. 522, 527, 79 S. Ct. 437, 3 L. Ed. 2d 480 (1959)).

"Under rational basis review, a state action is constitutional if . . . it applies alike to all members of the designated class," there are reasonable grounds for distinguishing between individuals inside and outside the class, and there is a rational relationship between the classification and the state's purpose. *Schatz v. Dep't of Soc. & Health Servs.*, 178 Wn. App. 16, 24, 314 P.3d 406 (2013). The nature of the classification does not have to be directly related to the state's purpose for a rational relationship to exist. *See id.* at 27; *Garcia*, 10 Wn. App. 2d at 920.

For example, in *Schatz*, two nurses and a nursing attendant who worked in the forensic wards of state-run psychiatric hospitals sued DSHS for violating their equal protection rights by paying them less than "their counterparts in the civil commitment wards." *Id.* at 19-20. We reasoned that while the forensic providers received lower pay despite doing the same work as the civil commitment providers, there were reasonable grounds to distinguish between the groups because their wages were based on "the collective bargaining agreement between the employees and the State," and the State's actions were "rationally related to its interest in abiding by collective bargaining agreements." *Id.* at 27.

In *Garcia*, caregivers challenged DSHS regulations preventing people with founded findings of child abuse or neglect from having unsupervised access to individuals with developmental disabilities. 10 Wn. App. 2d at 898-99. The regulations made exceptions for people

with findings entered before a certain date, requiring them to undergo character, competency, and suitability reviews instead. *Id.* Division One held that the regulations did not violate the equal protection clause because they did not "treat two similarly situated classes of people unequally." *Id.* at 920. The court explained that the group with findings entered after the cutoff date had access to "an administrative process to challenge" the findings "as unsubstantiated or false," but people with findings entered before the cutoff date "had no such opportunity." *Id*. There was therefore "a basis in reality for distinguishing between" the groups. *Id.*

Here, DSHS's regulations do not violate the nursing assistants' equal protection rights. As in *Schatz* and *Garcia*, the nature of the classification may not be directly related to the state's purpose. Rather, the classification is based on the settings where nursing assistants previously worked, and DSHS's purpose is to protect vulnerable adults and continue getting Medicaid funding. But the relationship does not need to be direct in order to be rational. *See Garcia*, 10 Wn. App. 2d at 920; *Schatz*, 178 Wn. App. at 27. DSHS's basis for the distinction is rational because Medicaid funding is tied to giving people who committed neglect in nursing homes the opportunity to petition for removal from the vulnerable adult abuse registry. In contrast, Medicaid funding is not tied to giving nursing assistants who committed neglected in other settings that opportunity.

Ensuring Washington state residents receive Medicaid funding is no small matter. The program "covers roughly 20% of all Americans, mostly consisting of children, people with disabilities, and seniors." David Wasserstein, Comment, *Working 9 to 5? Equal Protection and States Efforts to Impose Work Requirements for Medicaid Eligibility*, 69 AM. U. L. REV. 703, 714 (2019). A loss of Medicaid funding could have devastating consequences for the nearly two million

Washingtonians who currently rely on it to access health care.[9] The importance of this funding can explain why DSHS permits one group of nursing assistants to petition for removal despite its overall policy of making placement on the vulnerable adult abuse registry permanent. This policy is not unreasonable because, as stated above, preventing a person who has neglected a vulnerable adult, even once, from working with other vulnerable adults is a rational method for reducing instances of abuse or neglect.

Because DSHS has a rational basis for allowing the smallest group of nursing assistants necessary for complying with federal law to petition for removal, DSHS's regulations do not violate the equal protection clause.

## IV. ARBITRARY AND CAPRICIOUS REGULATIONS

The nursing assistants argue that DSHS's regulations, which create "two classes of nursing assistants who committed neglect," are arbitrary and capricious. Appellants' Opening Br. at 54. The nursing assistants also contend that DSHS acted arbitrarily and capriciously by denying them "any procedure" for challenging DSHS's "summary rejection of their petitions for removal" from the vulnerable adult abuse registry. Appellants' Opening Br. at 54. We disagree.

"A regulation is arbitrary and capricious only if it is willful, unreasoning, and taken without regard to the attending facts or circumstances." *Garcia*, 10 Wn. App. 2d at 918. "The scope of review under the arbitrary and capricious standard is very narrow, and the party asserting it carries a heavy burden." *Id.*

---

[9] *Medicaid & CHIP in Washington*, CTRS. FOR MEDICARE & MEDICAID SERVS., https://www.medicaid.gov/state-overviews/stateprofile.html?state=Washington (last visited February 2, 2024).

Here, as explained above, DSHS had a rational basis for creating two classes of nursing assistants who committed neglect: minimizing the number of nursing assistants with findings of neglect who could work with vulnerable adults while complying with requirements for obtaining Medicaid funding. For the same reasons, DSHS's regulations were not arbitrary and DSHS did not act arbitrarily and capriciously when it rejected Romero and Ayele's petitions for removal because it merely applied its own regulations, which provided no room for discretion.

The nursing assistants have not met their burden of demonstrating that DSHS's regulations and actions were arbitrary or capricious.

ATTORNEY FEES

The nursing assistants request attorney fees under the Equal Access to Justice Act, chapter 4.84.350 RCW. Here, the nursing assistants do not prevail, so they are not entitled to attorney fees under this statute.

CONCLUSION

DSHS did not exceed its statutory authority. Under current Washington Supreme Court precedent, DSHS's regulations did not violate procedural due process. Moreover, the regulations did not violate substantive due process or equal protection.

Finally, the regulations are not arbitrary and capricious, and DSHS did not take arbitrary or capricious actions in Romero and Ayele's cases. We affirm.

Glasgow, C.J.

We concur:

Lee, J.

Che, J.